[No. D047285. Fourth Dist., Div. One. Jan. 24, 2007.]

ANNE MANDERVILLE et al., Plaintiffs and Appellants, v. PCG&S GROUP, INC., et al., Defendants and Respondents.

**COUNSEL**

Stutz Artiano Shinoff & Holtz, Daniel R. Shinoff and Paul V. Carelli IV for Plaintiffs and Appellants.

Asaro, Keagy, Freeland & McKinley, Steven A. McKinley and Charles F. Campbell for Defendants and Respondents.

## OPINION

**NARES, J.**—Do exculpatory clauses in standardized forms used in the purchase and sale of real estate bar a claim for intentional misrepresentation brought by buyers of real property against the sellers' brokers alleging the brokers intentionally misrepresented the property could be subdivided, on the ground the buyers cannot show justifiable reliance as a matter of law? We conclude such exculpatory clauses do not preclude, as a matter of law, the buyers' showing of justifiable reliance, and thus, for purposes of the summary judgment proceeding at issue in this appeal, they do not bar the buyers' claim for intentional misrepresentation against the brokers.

We further conclude that any lack of due diligence by the buyers in conducting an investigation of the zoning and other laws restricting the development and use of the property also does not preclude, as a matter of law, the buyers' showing of justifiable reliance as an element of their claim for intentional misrepresentation. Therefore, we reverse the court's grant of summary judgment in favor of the brokers on the buyers' claim for intentional misrepresentation. Because the brokers did not seek summary adjudication of the buyers' remaining claims for negligent misrepresentation and suppression of facts, we need not decide whether those claims are barred by the exculpatory clauses and the buyers' alleged lack of investigatory due diligence.

## FACTUAL BACKGROUND

This action for deceit arose out of the purchase and sale of a parcel of land located in the City of El Cajon in San Diego County. The buyers were plaintiffs Anne and William Manderville (together the Mandervilles), and coplaintiffs Roseann and Rick Rinear (together the Rinears) (collectively Buyers). The Mandervilles are the parents of Roseann Rinear. The two couples intended to subdivide the property and build adjacent homes on the subdivided property.

### A. *The Two MLS Listings*

During their search for a suitable property they could subdivide into two lots, Buyers, through their agent Marilyn Fowler, found a multiple listing service (MLS) advertisement (the second MLS listing) for a property located in El Cajon, California (the property). In describing the property, the second MLS listing stated in part: "ALL USEABLE 2.62 ACRES *COUNTY STATES*

*1 ACRE MIN. LOT SIZE COULD BE SPLIT.*" (Italics added.) This listing was placed by the sellers of the property, Robert and Georgia Uecker (together the Ueckers or Sellers),[1] through their brokers, defendants Russ Clark, David Norberg and PCG&S Group, Inc. (collectively Brokers).

Clark prepared the language, "COUNTY STATES 1 ACRE MIN[IMUM] LOT SIZE COULD BE SPLIT," that was placed in the second MLS listing. He testified during his deposition that in so doing he had relied on the County of San Diego (County). Clark indicated that during his telephone conversation with "the County," he asked about the zoning for the property, and "they" told him the zoning was "RR1," which meant "[r]ural residential one acre per dwelling," and the property could be split. When asked to identify the person at the County with whom he spoke, Clark testified he had "[n]o idea" who it was, and he did not know why he did not write down the person's name. When asked whether that person was a male or female, Clark stated, "I don't recall."

Buyers and Fowler had seen a previous MLS listing of the same property (the first MLS listing) that did not contain the statement in the second MLS listing that "COUNTY STATES 1 ACRE MIN[IMUM] LOT SIZE COULD BE SPLIT." During his deposition, Clark stated that as of May 25, 2002—before he obtained the listing—an MLS listing prepared by a prior listing agent showed that the property had been listed for 347 days. Clark also stated that this prior MLS listing did not say the property "could be split."

### B. *Fowler's Confirming Telephone Call to Clark on Behalf of Buyers*

The parties acknowledge that "[s]ubdividing [real property] in rural San Diego County is a heavily regulated process, requiring the preparation and submission of a parcel map by a professional civil engineer, compliance with a 'labyrinth' of federal, state, and local regulations, and discretionary approval by a public body."

On June 22, 2002, as a result of the discrepancy in the two MLS listings, Fowler telephoned Clark on behalf of Buyers to confirm that the property could be split. During that call (the June 22 call), Fowler asked Clark whether the lot could be split. The Rinears were present during the call and observed Fowler write notes on the two MLS printouts (copies of the first and second MLS listings) regarding the question of whether the property could be split.

---

[1] In their appellants' opening brief, Buyers indicate that the Ueckers and Fowler were named as defendants in the operative first amended complaint, but Buyers dismissed their action against them. The Ueckers and Fowler are not parties to this appeal.

In those notes, Fowler wrote on the copy of the first MLS listing, *"The [s]plit has been approved* to what extent need to go to County & see—how far." (Italics added.) On the copy of the second MLS listing that indicated the lot could be split, Fowler wrote, "Splitable." At the end of her telephone conversation with Clark, Fowler made copies of her notes and gave them to the Rinears.

What Clark told Fowler during their telephone conversation is in dispute. Rick Rinear testified during his deposition that Fowler told him that Clark said to her the lot could be split, and this led him (Rick Rinear) to believe Buyers could build one house per acre. Rick Rinear stated he understood the second MLS listing meant "[t]he County states the lot could be split."

During her deposition, Fowler testified that although she did not have a specific recollection of Clark telling her the lot split had been approved, she believed Clark told her during the telephone conversation that the split had been approved because she would not have written in her notes "The [s]plit has approved" unless Clark had made that statement. Fowler indicated Clark had lied to her: "I feel like he . . . lied by omission, by not telling me that . . . there was only a split potential, that . . . not that it could be split. That he didn't . . . retract his statement that it could be split."

In a declaration supporting Brokers' summary judgment motion at issue in this appeal, Clark stated he did not tell Fowler during her inquiry that a split had been approved or that the property could be split, and he told her only that "the County" had told him that it could be split. He testified, "At no time did I agree with [Fowler], or any other person, to represent that the property had been split, or approved for a split, or that it could be split, except to the extent I repeated in the [second] MLS listing what the County had told me."

When asked whether the issue of "splitability" of the property arose during his telephone conversation with Fowler, Clark testified, "No, not that I recall." He denied mentioning the words "split" or "splitability" during the conversation, but acknowledged that Fowler asked him, "Can you build two houses on this property[?]," and he answered, "[Y]es." Clark also testified he told Fowler that her clients could build two houses on the property without splitting it, but then changed that testimony and stated: "There was a *potential* she could do it. Didn't tell her she could do it. 'You need to go down to the County before you write an offer. And, here, I'll fax you over all the information,' and I faxed her over all the information, whether it was 52 pages or whatever pages, I had. I faxed them all to her. She came back some

two or three days later with an offer and said, 'My clients are satisfied based on that information.' " (Italics added.)

### C. *The California Association of Realtors (CAR) Form Agreement*

CAR is an association of licensed realtors and realtor-associates that "develops and publishes standard forms and publications for specific use and reference by the real estate industry." (2 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 4:62, pp. 201–202.)

On June 24, 2002, two days after Fowler's June 22 call to Clark, Clark received from Fowler on behalf of Buyers an offer in the amount of $235,000 to purchase the property. Buyers made the offer in a standard CAR purchase agreement form titled "Vacant Land Purchase Agreement and Joint Escrow Instructions (and Receipt for Deposit)" (hereafter the CAR form agreement or the agreement).

Paragraph 7 of the CAR form agreement[2] stated that Buyers had the "right" to conduct inspections and investigations, and strongly advised Buyers to investigate the condition and suitability of all aspects of the property, as well as all matters affecting the value or desirability of the property, including ordinances affecting the future development and zoning of the property. Paragraph 7 also indicated that Buyers and Sellers were aware that Brokers did not guarantee and in no way assumed responsibility for the "condition" of the property.

Paragraph 15 provided that Buyers had 21 days after acceptance of their offer to "complete all inspections, investigations and review of reports and other applicable information for which [Buyers are] responsible." Paragraph 26 contained the following integration clause: "All understandings between

---

[2] Paragraph 7 ("BUYER'S INVESTIGATION OF PROPERTY CONDITION") of the CAR form agreement states in part: "Buyer's Acceptance of the condition of and any other matter affecting the Property is a contingency of this Agreement, as specified in this paragraph and paragraph 15. *Buyer shall have the right* at Buyer's expense . . . *to conduct* inspections, *investigations* . . . and other studies . . . . Brokers have not and will not verify any of the Items in A–M below, unless otherwise agreed in writing. *BUYER IS STRONGLY ADVISED TO INVESTIGATE* THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY AND ALL MATTERS AFFECTING THE VALUE OR DESIRABILITY OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO, THE ITEMS SPECIFIED BELOW. *IF BUYER DOES NOT EXERCISE THESE RIGHTS, BUYER IS ACTING AGAINST THE ADVICE OF BROKERS. . . . BUYER AND SELLER ARE AWARE THAT BROKERS DO NOT GUARANTEE AND IN NO WAY ASSUME RESPONSIBILITY FOR THE CONDITION OF THE PROPERTY.*" (Italics added.) Subparagraph B ("ZONING AND LAND USE") of paragraph 7 states: "Past present, or proposed laws [and] ordinances . . . affecting the current use of the Property, future development [and] zoning . . . . (Buyer should also investigate whether these matters affect Buyer's intended use of the Property.)"

the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement." The CAR form agreement also incorporated the following handwritten term set forth in paragraph 1(C) of Sellers' counteroffer No. 1: "Buyer[s] to satisfy themselves to use of property with warranties or representation to use."

### D. *Buyers' Investigation: "Property Project Profile," "Zoning Information," and "Notice of Negative Declaration"*

During discovery and the summary judgment proceeding at issue here, Buyers admitted that prior to the close of escrow they received from Clark, and reviewed, what Brokers referred to as a "disclosure package," which contained a copy of (1) a property project profile sheet, which indicated the existing zoning of the property was "RR-1" and the minimum lot size was one acre, but also indicated that the general plan designator number of the property was "24"; (2) a 1999 zoning information sheet prepared by the County's Department of Planning and Land Use listing the zone use regulations applicable to the property as "RR1" and the lot size as one acre, but indicating the general plan designation was "24"; and (3) a 1987 notice of negative declaration on the County's Department of Planning and Land Use letterhead specifying an "RR1 Use Regulation" for the property followed by the terms "Rural Residential" and "1du/1 acre," but also stating "Valle de Oro Subregional/Comm. Plan" followed by the terms "(24) Impact Sensitive" and "1 du/4, 8, 20 acres." Buyers also admitted that prior to the close of escrow, they conducted an investigation of laws and ordinances affecting the potential for splitting the property. In their summary judgment motion, Brokers asserted that Buyers' admissions established that they (Buyers) had "investigate[d] the specific representations . . . concern[ing] the ability to get County approval of a lot split."

### E. *Buyers' Discovery That the Property Could Not Be Split*

After the close of escrow, Buyers hired William A. Snipes, a civil engineer, to submit to the County on their behalf an application for permission to split the property. Snipes reported to Buyers that he had learned from his research at the County that the property could not be split because of its designation as "(24) Impact Sensitive" under the County's general plan, which specified a minimum lot size of four acres. Snipes explained to Buyers in a letter that "[t]he research at the County revealed some unfortunate information. The zoning allows a minimum lot size of 1.0 acres, but the general plan has a

slope dependent lot size criteria and the minimum lot size is 4.0 acres. To subdivide this property both elements have to be met. The property is too small to meet all the elements. This is the first time I have seen such a discrepancy between the zoning and the general plan."

## PROCEDURAL BACKGROUND

In their operative first amended complaint (the complaint), Buyers alleged three counts of deceit against Brokers: (1) intentional misrepresentation of facts, (2) negligent misrepresentation of facts, and (3) suppression of facts. All three counts were based on Buyers' allegations that (1) although the property in fact could not be split, Brokers stated in the second MLS listing "ALL USEABLE 2.62 ACRES COUNTY STATES 1 ACRE MIN. LOT SIZE COULD BE SPLIT," thereby falsely representing that the property could be split; (2) in reasonable diligence to confirm that the property could be split, Buyers met with their agent Fowler, showed her the second MLS listing, and caused her to verify that the property could be split; (3) Fowler responded to Buyers' inquiry by contacting Clark, who represented that the property could be split and that the split had already been approved; and (4) after her communication with Clark, Fowler represented to Buyers that the property could be split and was already approved for splitting. Buyers further alleged in all three fraud counts that they were ignorant of the falsity of Brokers' representations, they purchased the property in reliance on those false representations, and they would not have purchased the property had they known the actual facts.

### A. *Brokers' Summary Judgment Motion and Buyers' Opposition*

Brokers filed a motion for summary judgment, asserting two principal arguments: (1) There was no triable issue of material fact as to representations they made because the declarations of Clark and Norberg established that Brokers did not make a statement that the property could be split or that a lot split had been approved, and Fowler's deposition testimony showed that she was told, and then conveyed to Buyers, that the extent to which there had been an approval of a lot split was not clear and thus there was a need to go to County to investigate the possibility of getting a lot split; and (2) there was no fraud under any theory because Buyers contractually assumed the obligation to investigate and verify land use and future development of the property, they admitted they received and reviewed a disclosure package, they failed to diligently perform an investigation that would have revealed that splitting the property was inconsistent with the County's ordinance (general plan designator 24) requiring a minimum of four acres per dwelling unit, and thus they

did not justifiably or reasonably rely on the statements Brokers allegedly made.

In their written opposition, Buyers argued that Brokers undertook the obligation to list and sell the property after it had been "sitting" on the market for a period "in excess of [300] days" under the first MLS listing. Buyers also argued there was no dispute that when Brokers undertook this obligation, Brokers had information showing the property was placed in a "general plan designator" that required a minimum of four acres per dwelling, and thus Brokers knew at that time that splitability of the property was "uncertain," yet they changed the MLS listing to make the property more marketable and desirable by including the statement that it "could be split."

Buyers also asserted Brokers had a duty to investigate whether the statement that the property could be split was true when they changed the MLS listing. In addition, Buyers asserted that Brokers induced their reliance by affirming the representation in the second MLS listing by telling Fowler the property was splitable and the lot split had been approved, and thus triable issues of material fact existed as to "what Brokers knew, what they were told and by whom, what was said to the Buyers' agent [Fowler], and whether the Buyers justifiably relied on the representations of Brokers." Buyers further asserted that based on the second MLS listing and the conversation between Fowler and Clark, they relied on Clark's statements and believed they were buying a property that could be split, and that the split would be approved.

## B. *Order Granting Summary Judgment*

The court issued a tentative ruling granting Brokers' summary judgment motion on the grounds Buyers contractually assumed a duty to investigate zoning and land use limits on the future development of the property, and as a matter of law Buyers could not show they justifiably relied on statements Brokers made in connection with their listing of the property.

Specifically, the court's tentative ruling stated in part: "[A] *fact-finder in the circumstances of this case could conclude [Brokers'] MLS Listing was a knowing or negligent misrepresentation when it stated 'ALL USEABLE 2.62 ACRES COUNTY STATES 1 ACRE MIN. LOT SIZE COULD BE SPLIT.' A fact-finder could conclude [Clark] knowingly or negligently misrepresented the split had been approved. A fact-finder could also conclude [Buyers] reasonably relied on these misrepresentations and were not put on notice by the realty profile provided to them or their agent prior to making the first*

*offer to buy.* However, the final contract (Paragraph 7) among the parties and brokers provides that the buyer has been advised to investigate the property condition including limits placed on the future development and use of the property and that [Brokers] do not guarantee and in no way assume responsibility for the condition of the property and have not and will not verify zoning and land use. It also includes the handwritten language adopted in the final contract 'Buyer[s] to satisfy themselves to use of property with warranties or representation to use.' (Counter Offer No. 1.) This same contract also states 'All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement.' (Paragraph 26.) [¶] [Brokers] have met their initial burden of showing the absence of 'justifiable reliance', and therefore [Buyers] must make a prima facie showing that a triable issue of material fact exists. *The Court finds,* putting the evidence in the light most favorable to [Buyers], *that as a matter of law no 'justifiable reliance' can be shown.*" (Italics added.)

Following oral arguments on the tentative ruling, the court granted the parties leave to submit supplemental briefing on the issues of (1) whether a contract provision stating that all representations are contained in the contract bars an action for fraud, and (2) whether a defrauded party's negligence in investigating the accuracy of defendants' representations is a defense to a claim for intentional fraud. The court thereafter confirmed its tentative ruling and entered summary judgment in favor of Brokers. Buyers appealed.

## STANDARD OF REVIEW

On an appeal from a grant of summary judgment, we independently examine the record to determine whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) In performing our de novo review, we view the evidence in a light favorable to the losing parties (here, Buyers), liberally construing their evidentiary submission while strictly scrutinizing the prevailing parties' (here, Brokers) own showing, and resolving any evidentiary doubts or ambiguities in favor of the losing parties. (*Id.* at pp. 768–769.)

"[T]he part[ies] moving for summary judgment bear[] the burden of persuasion that there is no triable issue of material fact and that [they are] entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.)

"A defendant [moving for summary judgment] bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto." (*Ibid.*; see Code Civ. Proc., § 437c, subd. (*o*).) In such a case, the moving defendants "bear[] an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar, supra*, 25 Cal.4th at p. 850.)

If the moving defendants meet their burden of production, the burden shifts to the plaintiffs "to make [their own] prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 850.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the part[ies] opposing the motion in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.)

## DISCUSSION

In support of their appeal, Buyers argue the summary judgment granted in favor of Brokers should be reversed because: (1) the integration clause in paragraph 26 of the CAR form agreement at issue in this appeal does not bar Brokers' liability; (2) paragraph 7 of the agreement provided Buyers with the right, not the duty, to investigate whether they could split the property; (3) the court erred by holding that the "as is" provisions[3] in the agreement prevented Buyers from justifiably relying on Brokers' misrepresentations that the property could be split and had already received the County's approval for the split; and (4) there is a triable issue of material fact whether Buyers acted reasonably. For reasons we shall discuss, we hold that neither the exculpatory clauses contained in the CAR form agreement, nor Buyers' alleged lack of due diligence in exercising their right to investigate the zoning and other laws restricting the development and use of the property, bars Buyers' cause of action against Brokers for intentional misrepresentation as a matter of law.

### A. *Applicable Legal Principles (Element of Reliance)*

In Buyers' complaint, the gravamen of which is the allegation that Brokers deceived and harmed them by falsely representing both in the second MLS

---

[3] Buyers mischaracterize the exculpatory clauses at issue in this appeal when they assert the written agreement "contained '*as is*' *provisions* specifying that the buyers had been advised to investigate the property limits placed on the future development and use of the property, that the sellers did not guarantee and in no way assumed responsibility for the condition of the property including zoning and land use, and that [B]uyers were to satisfy themselves to use of the property with warranties or representations to use." (Italics added.) One commentator has referred to an "exculpatory" clause as "[a] contractual provision that exempts a party from liability." (1 Miller & Starr, Cal. Real Estate, *supra*, § 1:153, p. 632.)

listing and during Fowler's June 22 call to Clark that the property could be split, Buyers assert a claim for deceit based on intentional misrepresentation of facts.

■ To establish a claim for deceit based on intentional misrepresentation, the plaintiff must prove seven[4] essential elements: (1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff *reasonably relied on the representation*; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff. (CACI No. 1900; see Sources and Authority foll. CACI No. 1900, *supra*, pp. 921–922, citing Civ. Code,[5] §§ 1709, 1710, *Engalla, supra*, 15 Cal.4th at p. 974.)

■ The element of intentional misrepresentation at issue in this appeal is reasonable or justifiable reliance.[6] The California Supreme Court has explained that "[r]eliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction. [Citations.] 'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of

---

[4] The tort of deceit is sometimes stated with five, or even four, elements. (See Sources and Authority to Judicial Council of Cal. Civ. Jury Instns. (Fall 2006) foll. CACI No. 1900, pp. 921–922, citing *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974 [64 Cal.Rptr.2d 843, 938 P.2d 903] (*Engalla*) ["The elements of fraud that will give rise to a tort action for deceit are: ' "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage" ' "] & *Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1816 [52 Cal.Rptr.2d 650] [complaint for deceit must allege the following elements: "(1) a knowingly false representation by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages"].)

[5] All further statutory references are to the Civil Code.

[6] California authorities refer to the reliance element of a fraud or deceit cause of action as both "reasonable reliance" and "justifiable reliance." (See, e.g., CACI No. 1900 ["reasonabl[e]" reliance]; *Engalla, supra*, 15 Cal.4th at p. 974 ["justifiable" reliance]; *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 [44 Cal.Rptr.2d 352, 900 P.2d 601] [both "reasonable" and "justifiable" reliance].) Thus, under California law the terms "reasonable reliance" and "justifiable reliance" may be used interchangeably to refer to the element of reliance in a fraud or deceit cause of action.

whether a plaintiff's reliance is reasonable is a *question of fact*.' [Citations.] 'However, whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts.' [Citation.]" (*Alliance Mortgage Co. v. Rothwell, supra*, 10 Cal.4th at p. 1239.)

██ The *Alliance* court also explained that " '[n]egligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was *intentional* rather than negligent.' [Citation.] 'Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man.' [Citation.] 'If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery.' [Citations.]" (*Alliance Mortgage Co. v. Rothwell, supra*, 10 Cal.4th at pp. 1239–1240, italics added.)

B. *Analysis*

1. *Exculpatory Clauses*

In support of its finding that Buyers could not make a prima facie showing of justifiable reliance as a matter of law, the court relied on and cited the following exculpatory provisions in the CAR form agreement: (1) the integration clause set forth in paragraph 26, providing that all understandings between the parties were incorporated in the agreement; (2) paragraph 7, providing that Buyers had the "right" and were "strongly advised" to investigate the laws limiting the development and use of the property, Buyers would be acting against Brokers' advice if they did not exercise that right, Brokers had not and would not verify zoning and land use "unless otherwise agreed in writing," and Buyers were aware that Brokers did not guarantee or assume responsibility for the "condition" of the property; and (3) a handwritten term set forth in paragraph 1(C) of Sellers' counteroffer, which Buyers accepted, stating, "Buyer[s] to satisfy themselves to use of property with warranties or representation to use."

The court's finding that these clauses established that Buyers could not show justifiable reliance on Brokers' alleged intentional misrepresentations as a matter of law was erroneous. Section 1668, which was enacted in 1872, provides: "All contracts which have for their object, directly or indirectly, to exempt *any one* from responsibility for his own *fraud*, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." (Italics added.)

■ It is well established in California that a party to a contract is precluded under section 1668 from contracting away his or her liability for fraud or deceit based on intentional misrepresentation. In *Simmons v. Ratterree Land Co.* (1932) 217 Cal. 201 [17 P.2d 727] (*Simmons*), the trial court entered a judgment of rescission in favor of a buyer of a subdivided lot after finding the seller had fraudulently induced the sale by falsely representing to the buyer that the lot was zoned for business purposes. (*Id.* at pp. 202, 206.) The seller appealed, relying on contractual provisions to the effect that the buyer had viewed and investigated the property and did not rely upon any representations of the seller or its agents except those mentioned in the contract of sale, and that the contract contained all the representations, promises and statements made by the seller or its agents that had induced the buyer to enter into the contract. (*Id.* at p. 203.) Citing section 1668, among other authorities, the California Supreme Court affirmed the judgment of rescission. (*Simmons, supra*, 217 Cal. at pp. 204, 209.) The high court explained, "It is settled beyond doubt, manifestly on sound grounds of justice, that a seller cannot escape liability for his own fraud or false representations by the insertion of provisions such as are embodied in the contract of sale herein. [Citations.]" (*Id.* at p. 204.)

In *Smith v. Rickards* (1957) 149 Cal.App.2d 648 [308 P.2d 758] (*Smith*), the trial court entered a judgment of rescission of a real estate purchase contract in favor of the buyers after finding the seller had fraudulently induced the sale by means of false representations the seller knew were false. (*Id.* at pp. 649–650.) The seller appealed, claiming the buyers had disabled themselves from claiming fraud by agreeing to a provision in the contract that stated, " 'Buyer has personally examined said property and is familiar with its location and condition and is not relying upon any representation relating thereto.' " (*Id.* at pp. 653–654.) Citing section 1668 and *Simmons, supra*, 217 Cal. 201, the *Smith* court rejected the seller's claim and affirmed the judgment of rescission, stating, "Such provisions have often been held insufficient to protect a fraudulent vendor from being held responsible for his fraud." (*Smith, supra*, 149 Cal.App.2d at p. 654.)

More recently, the Court of Appeal in *Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1471–1472 [266 Cal.Rptr. 593] (*Blankenheim*) explained that "[u]nder [section 1668], a party may not contract away liability for *fraudulent or intentional acts* or for negligent violations of statutory law." (Italics added.)

■ Citing section 1668 and numerous other authorities, Witkin explains that "[a] party to a contract who has been guilty of *fraud in its inducement*

cannot absolve himself or herself from the effects of his or her fraud by any stipulation in the contract, either that no representations have been made, or that any right that might be grounded upon them is waived. Such a stipulation or waiver will be ignored, and parol evidence of misrepresentations will be admitted, for the reason that fraud renders the whole agreement voidable, including the waiver provision. [Citations.]" (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 304, pp. 330–331, some italics added, some italics omitted.)

Quoting section 1668, another commentator explains that " '[a]ll contracts which have for their objective, directly or indirectly, to except anyone from responsibility for his own *fraud* . . . are against the policy of the law.' A provision of a contract that unreasonably exempts a party from the legal consequences of a fraudulent . . . misrepresentation is unenforceable on grounds of public policy. Therefore, . . . a party who has *induced the other party to enter into the contract based on . . . an intentional . . . misrepresentation* cannot be relieved of liability by any . . . *exculpatory clause,* or other clause waiving liability, contained in the contract. Because the fraud renders the entire contract voidable, the clause intended to absolve the seller from liability is also voidable." (1 Miller & Starr, Cal. Real Estate, *supra,* § 1:153, pp. 632–633, fns. omitted, italics added.)

Here, the CAR form agreement expressly provides at page 9, following paragraph 35, that "Real Estate Brokers are not parties to the Agreement between Buyer and Seller." (Boldface omitted.) All of the exculpatory clauses at issue in this appeal are contained in the agreement between Buyers and Sellers, and are not part of any agreement between Buyers and Brokers.

However, the fact that Brokers were not parties to the agreement between Buyers and Sellers does not preclude application of section 1668 in this case in which Buyers allege Brokers induced them to enter into the agreement by means of intentional misrepresentations. The plain language of section 1668 (discussed, *ante*) shows that its provisions apply to "[a]ll contracts" the object of which is to directly or indirectly exempt "anyone" from responsibility for his or her "own fraud."

Brokers implicitly claim the exculpatory clauses in the CAR form agreement exempted them from responsibility for their alleged acts of intentional misrepresentation as a matter of law. We reject this claim. Assuming without deciding that Brokers have standing to invoke or rely upon the provisions of those exculpatory clauses as a defense to Buyers' cause of action for intentional misrepresentation, those provisions must be deemed to be against

the policy of the law within the meaning of section 1668, and are thus unenforceable. (See § 1668; *Simmons, supra,* 217 Cal. at p. 204; *Smith, supra,* 149 Cal.App.2d at pp. 649–650, 654; and *Blankenheim, supra,* 217 Cal.App.3d at pp. 1471–1472.)

In *Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Development Corp.* (1995) 32 Cal.App.4th 985 [38 Cal.Rptr.2d 783], the Court of Appeal, without citing section 1668, held that a contract clause stating the parties relied only on representations contained in the contract does not bar, as a matter of law, a claim for intentional misrepresentation. (*Ron Greenspan Volkswagen, Inc., supra,* 32 Cal.App.4th at pp. 987, 989, 992–993, citing *Simmons, supra,* 217 Cal. 201 and other case authorities.)

■ Applying the foregoing authorities, we conclude the exculpatory clauses in the CAR form agreement cannot and do not support the trial court's erroneous decision that, as a matter of law, Buyers cannot make a prima facie showing that they justifiably relied on Brokers' alleged intentional misrepresentations.

2. *Buyers' Alleged Failure to Diligently Investigate Brokers' Representations*

In a related claim, Brokers also assert on appeal, as they did in their memorandum of points and authorities in support of their summary judgment motion, that the element of justifiable reliance is negated as a matter of law because Buyers contractually undertook to, and did, investigate Brokers' representations concerning Buyers' ability to obtain County approval of a lot split, but failed to diligently perform that investigation, and thus Buyers must be "charged with all the knowledge [they] might have obtained had [they] pursued the inquiry to the end with diligence and completeness." Brokers assert the central core of the court's ruling granting summary judgment in their favor is that Buyers had no legal "right to rely" on Brokers' alleged misrepresentation because the CAR form agreement assigned to Buyers the duty to investigate the condition of the property. In essence, Brokers assert that Buyers could not justifiably rely on Brokers' alleged misrepresentations as a matter of law because Buyers would have discovered through a more diligent investigation that splitting the property was inconsistent with general plan designator 24, a County ordinance requiring a minimum of four acres per dwelling unit.

■ Brokers' claim is unavailing. It is well established in California that in an action for fraud or deceit, negligence on the part of the plaintiff in failing to discover the falsity of the defendant's statement is no defense when the misrepresentation was intentional. (*Alliance Mortgage Co. v. Rothwell,*

*supra*, 10 Cal.4th at pp. 1239–1240; *Seeger v. Odell* (1941) 18 Cal.2d 409, 414 [115 P.2d 977]; see also 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 812, p. 1173.) In *Seeger*, a unanimous decision of the California Supreme Court, Justice Traynor quoted an out-of-state case for the proposition that " '[n]o rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' [Citation.]" (*Seeger, supra*, 18 Cal.2d at p. 415.) The *Seeger* court also stated, "The fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar [the plaintiff's] recovery [citations], and it is well established that he is not held to constructive notice of a public record which would reveal the true facts. [Citations]." (*Id.* at pp. 414–415.)

■ Also, Brokers' claim is based on the false premise that Buyers contractually undertook to investigate Brokers' representations concerning Buyers' ability to obtain County approval of a lot split. It is a well-settled principle of contract interpretation that the language of a contract governs its interpretation if the language is clear and not absurd. (§ 1638 ["[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"]; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 741, p. 827 ["[w]here the language of a contract is clear and not absurd, it will be followed"] and case authorities cited therein.)

Here, the plain, unambiguous language of paragraph 7 of the CAR form agreement shows as a matter of law that the agreement did *not* impose on Buyers a contractual duty to investigate whether the property could be split. Paragraph 7 clearly states in part that (1) Buyers had the "*right*" to conduct investigations; and (2) Buyers were "strongly *advised*" to investigate the "condition and suitability" of "all aspects" of the property and "all matters affecting the value or desirability of the property," including ordinances affecting the future development and zoning of the property, and they would be "acting against the advice" of Brokers if they "[did] not exercise *these rights*." (Italics added.) Thus, paragraph 7 conferred upon Buyers the contractual *right*, not the contractual obligation, to conduct such an investigation.

■ Brokers rely on *Bank of America v. Vannini* (1956) 140 Cal.App.2d 120 [295 P.2d 102] (*Vannini*) for the proposition that "when the duty to investigate is *contractually* assigned to the purchaser of real property, the purchaser is precluded from later suing the seller for fraud because the purchaser has, as a matter of law, no legal 'right to rely' on any alleged material misrepresentations by the seller that predate the contract." (Italics added.)

Brokers' reliance on *Vannini* is misplaced. That case involved the purchase and sale of an abandoned gold mine in which the purchasers entered into an

option agreement to buy the mine, but expressly and specifically agreed to investigate the property before exercising the option by clearing water and debris out of the mine and, at their election, digging an exploratory tunnel within a specified period of time from the date of the agreement. (*Vannini, supra,* 140 Cal.App.2d at pp. 122–123, 128, 130–131.) The purchasers did not clear the mine and complete the investigation within the period specified in the agreement. (*Id.* at p. 132.) Years later, after exercising the option to buy the mine, the purchasers discovered the falsity of the sellers' representation that ore in commercial quantities existed in the mine. (*Ibid.*)

The sellers in *Vannini* brought an action against the purchasers to recover money they allegedly owed the sellers under the option agreement, and the purchasers filed an amended answer and cross-complaint, both of which were predicated on the theory that the sellers had fraudulently induced them to enter into the agreement. (*Vannini, supra,* 140 Cal.App.2d. at pp. 124, 132.) The trial court sustained the sellers' demurrers to the purchasers' amended answer and cross-complaint without leave to amend and entered judgment in favor of the sellers. (*Id.* at p. 124.)

The *Vannini* court addressed the issue of whether the trial court properly sustained without leave to amend the sellers' demurrer to the purchasers' amended answer, which (like the purchasers' cross-complaint) was based on an allegation that the sellers had induced them to enter into the option agreement by means of an intentional misrepresentation. (*Vannini, supra,* 140 Cal.App.2d at pp. 125–126, 130.) Noting that under the pleaded facts the purchasers had obligated themselves under the option agreement to clear the mine and investigate the property within 17 months of the date of the option agreement (*id.* at pp. 130, 132), the Court of Appeal stated that "the real question [was] *not* whether [the purchasers] *relied* on the false representations, but whether they had the *legal right to rely* upon them." (*Id.* at p. 131, italics added.) The court concluded that the purchasers' express agreement to conduct their own investigation "amounted to an agreement [they] were not to rely on the representations made by [the sellers], but were to rely on their own investigation." (*Ibid.*) The *Vannini* court held, "as a matter of law, that [the purchasers] had *no legal right to rely on the false representations* at the time that they exercised the option," and thus the trial court had properly sustained the demurrer to the purchasers' amended answer. (*Id.* at p. 132, italics added.) The court reasoned that if the purchasers had performed their contractual duty to clear the mine and investigate the property, "they would have gained full knowledge of the falsity of the representations made to induce the contract." (*Ibid.*)

*Vannini* is factually and legally distinguishable. There, as already discussed, the purchasers expressly agreed to clear the gold mine and investigate

the property within a specified period of time before they exercised the option agreement. Here, however, Buyers entered into a purchase agreement, not an option agreement, under which they acquired the contractual *right*, not the contractual obligation, to investigate the condition of the property, including whether they could obtain County approval to split the property into two parcels. *Vannini* is therefore inapposite.

### 3. *Buyers' Prima Facie Showing of Justifiable Reliance*

Brokers do not challenge the court's express findings that (1) "[a] fact-finder could conclude [Brokers] *knowingly* . . . *misrepresented* the split had been approved," and (2) "[a] fact-finder could also conclude [Buyers] *reasonably relied* on these misrepresentations and were not put on notice by the realty profile provided to them or their agent prior to making the first offer to buy." (Italics added.) Rather, their principal contentions are (1) the court "did not commit error by ruling on the issue of 'justifiable reliance' as a matter of law" because the CAR form agreement "assigned the duty to investigate the condition of the property to Buyers"; and (2) Buyers "admitted that they conducted an investigation of the laws and ordinances affecting the potential for splitting the . . . property prior to close of escrow," and thus they must be "charged with all the knowledge that [they] might have obtained had [they] pursued the inquiry to the end with diligence and completeness."

Viewing the evidence in a light favorable to the losing parties (here, Buyers), liberally construing their evidentiary submission while strictly scrutinizing the prevailing parties' (here, Brokers) own showing, and resolving any evidentiary doubts or ambiguities in favor of the losing parties, as we must (*Saelzler v. Advanced Group 400, supra*, 25 Cal.4th at pp. 768–769), we conclude the record demonstrates that Buyers met their burden of making a prima facie showing that there are triable issues of material fact (1) whether Brokers intentionally misrepresented that, according to County, the property could be split and the split had been approved; and (2) whether Buyers justifiably relied on Brokers' alleged intentional misrepresentations. As discussed more fully in the factual background, *ante*, the parties dispute what Clark told Fowler during their June 22 telephone conversation, as shown by the deposition testimony of Rick Rinear, Fowler and Clark, and Clark's declaration in support of Brokers' summary judgment motion. The issues of whether Brokers intentionally misrepresented that the County had stated the property could be split and the split had been approved, and whether Buyers' reliance on Brokers' statements was reasonable under all of the circumstances, are questions of material fact that must be decided by the trier of fact.

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings. Buyers shall recover their costs on appeal.

Benke, Acting P. J., and Haller, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 11, 2007, S150791. George, C. J., did not participate therein.