Filed 12/31/13  Stone v. Mitchell CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ROLAND STONE, et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>JOHN C. MITCHELL,<br><br>Defendant and Appellant. | A131442<br><br>(San Francisco County<br>Super. Ct. No. CGC-08-479284) |

The petition for rehearing is denied.  The opinion filed herein on December 10, 2013, is ordered modified as follows:

On page 13, this sentence is added to the Disposition after the sentence "The judgment is affirmed.":

The parties shall bear their own costs on appeal.

There is no change in the judgment.

Dated:  _____          Signed:  _____

1

Filed 12/10/13  Stone v. Mitchell CA1/4 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| ROLAND STONE, et al.,<br><br>        Plaintiffs and Respondents,<br>v.<br><br>JOHN C. MITCHELL,<br><br>        Defendant and Appellant. | A131442<br><br>(San Francisco County<br>Super. Ct. No. CGC-08-479284) |

Plaintiffs Roland and Jane Stone[1] bought an apartment building (the building or the property) from defendant John Mitchell, believing its 10 apartments could all be legally rented out.  They later learned that a larger unit had been divided into two without a building permit, and therefore only nine of the units were legally permitted.  They brought this action against Mitchell for breach of contract, negligence, and negligent misrepresentation.  On the negligence claim, the jury found in plaintiffs' favor, but also determined the Stones were 60 percent responsible for their injuries.  The jury found in Mitchell's favor on the other two claims.  Both plaintiffs and Mitchell have appealed.  We shall affirm the judgment.

**I. BACKGROUND**

**A.    Mitchell's Purchase and Ownership of the Property**

The apartment building was constructed in the late 1960's or early 1970's, with a total of nine legally permitted units.  At some point after that, probably in the mid- to

---

[1] We shall refer to Roland Stone as "Stone," and Roland and Jane Stone collectively as "the Stones" or "plaintiffs."

late-1970's, a two-bedroom unit was divided into two one-bedroom units (units 3015A and 3015B), without a permit.[2] In 1978 or 1979, the zoning of the property was changed to single-family residential, and as a result new units could not legally be added to existing multi-unit apartment buildings.

Mitchell bought the property in 2001 from Antonio Castellucci, who had owned it only briefly. Castellucci did not know, and did not tell Mitchell, that one unit had been divided into two without a building permit. The contract required Castellucci to provide a "3R" or a similar report that would show the legality of the units in a multi-unit building, but Castellucci did not know whether his agent provided Mitchell with such a report.[3]

The property had 10 apartments, each with a separate address and mailbox. However, it appears that the property had only nine Pacific Gas and Electric Company (PG&E) meters, which were next to the mailboxes. Units 3015A and 3015B and the common areas shared a meter.

The property was inspected and appraised in 2002 when Mitchell applied for a loan. The appraisal report noted that the "[p]resent [i]mprovements . . . do not conform to zoning regulations." Mitchell testified that he did not review the appraisal report.

During the time Mitchell owned the property, he knew there were only nine PG&E meters, and he paid a single bill for the two units in question and the common areas. He did not investigate the reason the units and the common areas shared a meter or try to have them put on separate meters. Mitchell testified that both when he bought the

---

[2] By the early 1980's, the county assessor's office assessed the property as containing 10 units.

[3] The agent testified that Napa County did not have such a report, and he did not recall complying with this requirement. He was not aware of any information indicating that work had been done on the property without a building permit. He did not recall noticing that there were only nine meters for the 10 apartments, and testified that if he noticed such a thing, he would normally ask the seller the reason, and go to the city to find out if the seller did not know.

property and when he sold it to the Stones, he believed it contained 10 legal income-producing apartments.

**B.      Marketing of the Property and Sale to the Stones**

In 2006, Mitchell hired Philip Moreno, a real estate broker, to market and sell the property.[4]  Mitchell told Moreno it consisted of 10 apartments, and gave Moreno copies of the 10 leases.  The leases all provided that the tenants were responsible for payment of all utilities except water and garbage.

Moreno visited the property, and believed there were 10 separate meters.  Based on the information Mitchell had given him, he prepared a sales flyer.  The flyer described the property as a 10-unit apartment building, and listed the monthly rent for the units.  A disclaimer at the bottom of the flyer stated:  "This information has been secured from sources we believe to be reliable, but make no representations or warranties, expressed or implied, as to the accuracy of the information.  Buyers are advised to investigate and verify the above information and make their own market evaluation."  He also prepared an income and expense statement, which listed among the operating expenses the aggregate amount of the costs of the utilities, without breaking them down further.  The statement indicated that the apartment building would yield a 6.17 percent annual return on the investment based on the income and expenses and an asking price of $1,225,000.  Moreno also prepared a multiple listing service (MLS) listing that stated the tenants paid for their own electricity.  Although Mitchell had told Moreno he was paying the PG&E bills for units 3015A and 3015B, Moreno did not include this information in any sales materials or multiple listing service entries.  At trial, Moreno agreed that illegal "in-law" units sometimes lacked a separate meter.

Stone contacted Moreno about another property, and Moreno told him about the apartment building and sent him the flyer and income statement.[5]  Moreno also gave

---

[4] Moreno was originally a defendant in this action, but reached a settlement with plaintiffs before trial.

[5] Mitchell never met Stone and never spoke with him, instead conducting the transaction entirely through Moreno.

Stone a rent roll listing the rental income from each of the apartments. It did not indicate that the owner was responsible for paying the utilities for units 3015A and 3015B, and Moreno never told Stone that that was the case. He gave Stone copies of the leases—including the lease for unit 3015B—which provided that the tenants would pay for the utilities except water and garbage, and Stone believed the tenants did so. Based on the documents he received, Stone believed the property had 10 legal income-producing units and would provide a good return on his investment. However, Moreno never told him the property contained 10 legally permitted units.

Stone testified that when he visited the property with Moreno, he noticed there were only nine electric meters, and asked Moreno about it. Moreno told him there were two additional meters in the garage. The door to the garage did not open properly, and according to Stone, they could not enter it. Before the close of escrow, Stone never entered the garage to verify the presence of the meters. [6]

Moreno gave Stone a report prepared by Hypersafe Property Inspection (the Hypersafe report) for another person who had been interested in the property. Moreno suggested the Stones read the report, and he put a "Read & Approved" stamp on it. Moreno also told the Stones they could have another report prepared if they preferred not to use the Hypersafe report. The report contained the disclaimer that it was "not intended for use by anyone other than the buyer/client named herein. No other person should rely on the information in this report." The "Electrical" section of the Hypersafe report noted: "Main Service panel (unlabeled) at the right exterior wall of the building appears to serve Unit 3015A and Unit 3015B (single meter for both units) as well as garage, laundry area and exterior lighting." Under a section entitled "General Notes—Specific Units," the report noted in its discussions of Units 3015A and 3015B that they were "not provided with separated metered electric service," and that they shared a common meter.

---

[6] Moreno, on the other hand, testified that although the garage was full and the door did not open completely, he and Stone were able to go into it and look around, and that Stone wanted to look for meters but that they did not see any in the garage and concluded they were all in the front of the building.

4

The Stones returned the Hypersafe report to Moreno with the stamp "Read & Approved" initialed and dated. However, Stone did not read the report past the point where it stated that it was not intended for use by anyone other than the person for whom it had been prepared—the previous prospective buyer. He told his wife, for whom he acted as agent, not to read the report, and she initialed it without reading it.

Stone testified at trial that he had a general contractor inspect the property, but he did not receive a formal inspection report. The contractor did not inspect the electrical system. In his pretrial deposition, however, Stone testified that he never had any kind of inspection made before the close of escrow. He did not check on the building permits because it was not customary to do so with a building that old.

Stone was a realtor, held a real estate broker's license, had been involved in selling multi-unit residential properties in the past, and had owned approximately three such buildings other than the one at issue in this case. All of them had had separate meters for each apartment.

Don Jose Barrelier, a real estate broker for whom Stone once worked, testified that when a buyer removed an inspection contingency, it indicated that the inspection had been made and the property was acceptable to the buyer based on the inspection.

Barrelier testified that in his work representing sellers, he had had occasion to obtain copies of reports previously obtained by potential buyers, and he would always pass them on to a new potential buyer, as part of his duty to disclose problems with the property. He would ask the buyer to acknowledge in writing having received and read the reports. He would never advise a client not to read such a disclosure report, or to sign one as read and approved if the client had not read it.

Barrelier testified that the notations in the Hypersafe report that units 3015A and 3015B shared a common meter with each other and with the common areas could be a "red flag," calling for further investigation, although it did not necessarily mean the units were not permitted.

5

## C.    The Contract

The Stones agreed to buy the property for $1,200,000, with $75,000 to be credited to them for repairs.  The sales contract included an inspection contingency.  In his accepted counter-offer, Mitchell included this provision:  "Buyers and contractor to inspect property with in [*sic*] 10 days from acceptance and to release this contingenie [*sic*] 3 days there after [*sic*]."

The contract included among its terms and conditions a "Buyer Inspection Advisory (C.A.R. Form  BIA)," which advised the buyer to inspect the land and improvements, both personally and with professionals, and to read the professionals' written reports.  Under the heading "Buyer Rights and Duties," the Buyer Inspection Advisory stated:  "You have an affirmative duty to exercise reasonable care to protect yourself, including discovery of the legal, practical and technical implications of disclosed facts, and the investigation and verification of information and facts that you know or that are within your diligent attention and observation.  The purchase agreement gives you the right to investigate the Property.  If you exercise this right, and you should, you must do so in accordance with the terms of that agreement.  This is the best way for you to protect yourself.  It is extremely important for you to read all written reports provided by professionals and to discuss the results of inspections with the professional who conducted the inspection."  It also advised the buyer to investigate, inter alia, "BUILDING PERMITS, ZONING AND GOVERNMENT REQUIREMENTS:  Permits, inspections, certificates, zoning, other governmental limitations, restrictions, and requirements affecting the current or future use of the Property, its development or size. (Such information is available from appropriate governmental agencies and private information providers.  Brokers are not qualified to review or interpret such information.)"  The buyer also agreed that the broker would "not be responsible for inspecting public records or permits concerning the title or use of Property."

The contract also provided, in bold print:  "NOTE TO BUYER:  You are strongly advised to conduct investigations of the entire Property in order to determine its present condition since Seller may not be aware of all defects affecting the Property or other

6

factors that you consider important. Property improvements may not be built according to code, in compliance with current Law, or have had permits issued."

Under the terms of the contract, "If Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in a separate written agreement between Buyer and Seller, Buyer shall conclusively be deemed to have: (i) completed all Buyer investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; (ii) elected to proceed with the transaction; and (iii) assumed all liability, responsibility, and expense for Repairs or corrections pertaining to that contingency or cancellation right, or for inability to obtain financing." Before the close of escrow, the Stones removed all contingencies.

## D. Events After the Sale

Escrow on the sale closed on November 30, 2006. In January 2007, the PG&E bill for units 3015A and 3015B and the common areas was $1,109.53. Stone was surprised by the bill, asked his property manager to look into the matter, and learned that the two units and the common area shared a meter. He tried to have separate meters installed for the two units, but was unable to obtain the necessary permit because the property only had nine legal units. Until the county told him that, Stone believed he owned 10 legal units. He made unsuccessful efforts to legalize the 10th unit, but the county ultimately told him he would have to reduce the number of units on the property to nine. Stone then converted the two units into a larger single unit.

## E. Trial

During trial, Mitchell moved for nonsuit, and the trial court denied his motion. The jury found in plaintiffs' favor on their cause of action for negligence, found the total damages were $111,400, and assessed 40 percent responsibility to Mitchell and 60 percent responsibility to the Stones based on their own negligence. The jury found in defendant's favor on the causes of action for negligent misrepresentation and breach of contract. Both Mitchell and the Stones made motions for judgment notwithstanding the verdict (JNOV), which the trial court denied.

## II. DISCUSSION

### A. Mitchell's Appeal

#### 1. *Denial of Mitchell's Motions for Nonsuit and JNOV*

Mitchell contends the trial court erred in denying his motions for nonsuit and JNOV. We review the court's rulings on these motions for substantial evidence. (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp*. (2007) 157 Cal.App.4th 835, 845.) We "read the record in the light most advantageous to the plaintiff[s], resolve all conflicts in [their] favor, and give [them] the benefit of all reasonable inferences in support of the original verdict." (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703.)

Mitchell argues he had no legal duty to plaintiffs except to disclose information affecting the value and desirability of the property that he or his agent actually knew, and that he had no duty to make an affirmative inspection of public records or permits. (See *Holmes v. Summer* (2010) 188 Cal.App.4th 1510, 1518–1519 [where seller knows of facts materially affecting value or desirability of property and knows facts are not within buyer's diligent attention and observation, seller must disclose them to buyer]; *Watt v. Patterson* (1954) 125 Cal.App.2d 788, 793–794 [where all pertinent facts known to buyer and seller of house operated as rooming house, defendant had no duty to know about zoning regulations restricting its use and inform plaintiffs of them]; *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1382 [fraud claim based on nondisclosure arises where there is confidential relationship, where defendant has made representation likely to mislead absent disclosure, when there is active concealment, or where one party has sole knowledge or access to material facts and knows facts are not known to or reasonably discoverable by other party]; *Shapiro v. Sutherland* (1998) 64 Cal.App.4th 1534, 1544; Civ. Code, § 2079.3.)

Here, the only theory upon which Mitchell was found liable was that of negligence. There was evidence that Mitchell knew he paid the PG&E bills for units 3015A and 3015B; that neither he nor his agent, Moreno, told the Stones that fact; that the bill for the first full month Stone owned the apartment was over $1,100, significantly

8

offsetting his income on those units; that the fact that the units shared a meter with each other and with the common areas could be a "red flag" calling for further investigation; and that Mitchell gave Moreno copies of the leases requiring the tenants to pay their own utility bills.[7] Because these facts affected the value and desirability of the property, Mitchell had a duty to provide full and accurate information about them. Additionally, from these facts, the jury could reasonably conclude Mitchell acted negligently—that is, as it was instructed, that he "fail[ed] to use reasonable care to prevent harm to . . . others" and that he "[did] something that a reasonably careful person would not do in the same situation or fail[ed] to do something that a reasonably careful person would do in the same situation."

We recognize that the Stones received, and indicated they had read, the Hypersafe report, which noted that units shared a common meter with each other and with the common areas, and that they did not investigate the matter further despite the explicit advisements in their contract that they should investigate the entire property and that improvements might not have been built according to code or in compliance with current law or have had permits issued. The jury, however, appears to have considered these facts and adjusted for them when it found the Stones were also negligent and assigned to them 60 percent of the responsibility for their own harm. On the facts of this case, the trial court did not err in denying Mitchell's motions for nonsuit and JNOV.

2. *Motion in Limine*

Mitchell next complains that the trial court erred when, in response to plaintiffs' motion in limine, it precluded him from testifying that he never represented to plaintiffs that he was selling them 10 *legal* units. We review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639–640.) Even where the trial court improperly excludes evidence, we will not reverse unless the appealing party shows it is

---

[7] In addition, Moreno, Mitchell's agent, prepared an MLS listing stating the tenants paid for their own electricity. It is not entirely clear from our review of the record whether the Stones saw that MLS listing before they bought the property.

9

reasonably probable a more favorable result would have been reached absent the error. (*Poniktera v. Seiler* (2010) 181 Cal.App.4th 121, 142.)

We see no possibility that Mitchell was adversely affected by the trial court's ruling. Plaintiffs made no claim that Mitchell or Moreno told them explicitly that the units were "legal." In fact, the evidence was clear that Mitchell had no direct dealings with the Stones, and that Moreno never told Stone the units were "legal." Rather, plaintiffs took the position that because Mitchell represented that the apartment building included 10 units, the Stones were entitled to infer that all 10 of the units could legally be offered for rent. There is thus no basis to conclude that the absence of Mitchell's testimony led the jury to believe that Mitchell told Stone *explicitly* that all 10 units could legally be rented or that the additional testimony would have affected the result of the trial.

*3. Instructional Error*

The trial court read the following instruction to the jury: "Special Jury Instruction No. 1, Breach of Contract. [¶] When a seller accurately describes the current use or income from the property, as the defendant Mr. Mitchell did in this case, that is, he was selling ten income-producing units, there is an implied representation that the property may be used by the plaintiffs for the same purposes and produce the same future income. Sean Mitchell's representation that he has ten income-producing apartment units was a positive assertion." Mitchell contends this instruction constituted error. He relies on cases holding that a cause of action for negligent misrepresentation requires a positive assertion, rather than a mere omission or implied representation. (See *Diediker v. Peelle Financial Corp.* (1997) 60 Cal.App.4th 288, 297–298; *Wilson v. Century 21 Great Western Realty* (1993) 15 Cal.App.4th 298, 306–307.)

We reject Mitchell's claim of prejudicial error. The instruction applied only to plaintiffs' cause of action for *breach of contract*—a claim the jury decided in Mitchell's

10

favor. We see no reason to conclude the jury applied the rule to the cause of action for negligence.[8]

## B. Plaintiffs' Cross-Appeal

In their cross-appeal, the Stones argue the verdicts are fatally inconsistent: that is, that having found Mitchell liable for negligence, the jury could not logically have found him *not* liable for the claims for breach of contract and negligent misrepresentation that were based on the same set of facts.

As to the cause of action for breach of contract, the Stones contend the information Mitchell and his agent gave them indicated that the property contained 10 rentable units, that this information became a positive assertion that the 10 units could legally be rented to tenants, that this assertion became a term of the contract, and that Mitchell breached the contract by failing to deliver title to 10 legally rentable units. In finding in Mitchell's favor on the breach of contract cause of action, however, the jury reached only the first question on the verdict form, which asked, "Did Roland Stone and Jane C. Stone do all, or substantially all, of the significant things the contract required them to do?" The jury answered, "No." Evidence to support this verdict can be found in the contract, which not only strongly advised the Stones to inspect the property and stated the Stones had "an affirmative duty to exercise reasonable care to protect yourself, including discovery of the legal, practical and technical implications of disclosed facts, and the investigation and verification of information and facts that you know or that are within your diligent attention and observation," but also provided: "Buyers and contractor to inspect property with in [*sic*] 10 days from acceptance and to release this contingenie [*sic*] 3 days there after [*sic*]." It appears the jury based its verdict on the conclusion that the contract gave the Stones the affirmative obligation to inspect the property before removing the inspection contingency.

---

[8] We also note that the trial court immediately went on to instruct the jury that in order to find Mitchell liable for negligent misrepresentation, "an applied [*sic*] assertion or implied representation is not enough. A positive assertion on his part is required"— precisely the legal principle Mitchell relies on.

11

Plaintiffs contend this conclusion is contrary to law, and that they were entitled to rely on Mitchell's representations without further investigation. They rely on *Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486, 1503, which concludes that a form contract giving a buyer the *right* to inspect property and strongly advising such an inspection did not impose a *duty* to inspect the property. Here, however, in addition to the form language giving the Stones such rights and advisements, the contract included the additional language providing that the Stones were "to inspect property" within 10 days of acceptance and to release the inspection contingency three days thereafter. This language may reasonably be understood to impose on the Stones the obligation to carry out such an inspection—and Stone testified at his deposition that he did not inspect the property before releasing the contingency. This conclusion is not inconsistent with the jury's verdict on the negligence cause of action—that is, the jury could logically conclude both that the Stones did not do all the significant things the contract required them to do, and that Mitchell acted negligently toward them to their detriment.

Nor is the jury's verdict on the cause of action for negligent misrepresentation necessarily inconsistent with the verdict on the negligence claim. The jury was instructed that Mitchell's representation that he had 10 income-producing apartment units was a positive assertion, and that when he represented that he was selling 10 income-producing units, "there [was] an *implied representation* that the property may be used by the plaintiffs for the same purposes and produce the same future income." (Italics added.) The court went on to instruct the jury, "In order to find Mr. Mitchell liable for negligent misrepresentation, an applied [*sic*] assertion or *implied representation is not enough. A positive assertion on his part is required.*" (Italics added.) (See *Wilson v. Century 21 Great Western Realty, supra,* 15 Cal.App.4th 298, 306.) In the special verdict form for the negligent misrepresentation cause of action, the jury answered only the first question, which asked, "Did [Mitchell] make a false representation of an important fact to Roland Stone and Jane C. Stone?" The jury answered, "No." Based on the instructions, the jury could reasonably have concluded Mitchell made a positive representation about the

current use of the property, but that the representation that plaintiffs could continue to use the property in the same way was only an *implied* representation, which was insufficient to support a cause of action for negligent misrepresentation. This verdict is not inconsistent with a conclusion that—whether or not he made a positive assertion about plaintiffs' legal ability to rent out all 10 units—Mitchell failed to use reasonable care to prevent harm to plaintiffs.

### III. DISPOSITION

The judgment is affirmed.

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Humes, J.

13