Filed 2/24/15  Olague v. Klimenko CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| EDWARD H. OLAGUE, SR., as Trustee, etc., | B249230 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC419984) |
| v. | |
| WLADIMIR JOHN KLIMENKO et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael M. Johnson, Judge.  Affirmed.

Law Offices of Robert A. Brown and Robert A. Brown for Defendants and Appellants.

Law Offices of Sherri S. Shafizadeh, Sherri S. Shafizadeh; Fasel Law and Thomas Fasel for Plaintiff and Respondent.

_____

Defendants Wladimir John Klimenko and Ruben Martinez, parties to a sham real estate transaction in which a naive and trusting landowner was defrauded into relinquishing ownership of real property, appeal from adverse judgments for fraud and declaratory relief, respectively. Klimenko contends the fraud judgment against him is barred by the doctrine of res judicata or, alternatively, that there is insufficient evidence to support the judgment. Martinez argues there is no basis upon which to award declaratory relief against him. We affirm.

## FACTUAL BACKGROUND

Consistent with the requirement that we construe the facts most favorably to the judgment, and because the issues on appeal are primarily disputes of law, this court largely adopts the factual history relayed in the trial court's considerably useful statement of decision.

In 1998, Theodosia Olague (Theodosia) created the Theodosia A. Olague living trust, dated April 28, 1998 (trust) of which she was trustee. Her home on Tilmont Avenue in Pico Rivera (Tilmont property) was an asset of the trust. Theodosia's son, Edward Olague, Sr., (Olague) was designated as successor trustee upon Theodosia's death, resignation or incapacity, and he and his brothers were the beneficiaries of the trust.

Sometime before 2005, Theodosia became incapacitated by dementia and, as successor trustee, Olague assumed management of trust assets. Theodosia continued living at the Tilmont property, where she was cared for by one of her sons and his wife. However, by 2005, Theodosia's family determined that her health and mental state had deteriorated to the point that she required additional care in an assisted living facility. Because Theodosia's social security income was insufficient to fund her care, Olague, with his brothers' approval, decided to sell the Tilmont property to generate additional funds.

Klimenko is a licensed, experienced real estate agent familiar with the Pico Rivera area who was a friend of the Olague family. Olague and his brothers trusted Klimenko and believed he had their best interests in mind.

In February 2005, Klimenko and Olague discussed prices, listing and sales arrangements in connection with Olague's desire to sell the Tilmont property. Klimenko told Olague that he wished to purchase the Tilmont property himself. After discussing the matter with his siblings, Olague agreed to sell Klimenko the Tilmont property for $290,000. Olague and his brothers agreed to Klimenko's terms, which were: the trust would lend Klimenko the entire purchase price and, in return, receive interest-only payments through a 30-year promissory note secured by a deed of trust.

The written agreement between Olague, as successor trustee, and Klimenko, as buyer, was memorialized in a written agreement dated March 24, 2005, on a standard California Association of Realtors contract form for residential purchase agreement and joint escrow instructions. It specifies a purchase price of $290,000, with no deposit or down payment. The seller was to carry back the full purchase price at 6.5 percent interest, in exchange for a 30-year promissory note secured by a trust deed.

The agreement called for Klimenko to make interest only payments ($1,570.84 per month) through the 30-year term, with the principal due as a balloon payment in 2035. The note was due and payable in the event of Theodosia's death or if Olague required additional funds to cover his mother's expenses. Klimenko also gave Olague a June 14, 2005 installment note. With the exception of a $0.01 difference in the monthly payment, that note tracked the terms of the purchase agreement, and contained a provision that the principal would become due and payable if Klimenko sold or alienated the Tilmont property. Klimenko provided Olague a first trust deed to secure the promissory note. Olague gave Klimenko a grant deed for the Tilmont property.[1]

_____

[1] Olague believed the sales agreement contained a provision permitting him to raise Klimenko's payments in the event Theodosia's expenses increased. It did not (only a provision requiring payment of the principal if he required additional funds for Theodosia's maintenance). Nevertheless, in 2007 Klimenko behaved as though it did include such provision in order to conceal his sale of the Tilmont property, and agreed to an increase in his payments at Olague's request after Theodosia's health expenses increased.

Klimenko testified that Olague agreed to terms that clearly favored Klimenko (lender financing, interest-only payments and no down payment) in order to ensure Theodosia maintained her eligibility for Medi-Cal by receiving limited cash transfers. The trial court gave that explanation no credence. Instead, the court credited Olague's testimony that he and his siblings planned to cover their mother's expenses without Medi-Cal benefits. The court found Olague agreed to terms that clearly favored Klimenko because Olague: (1) deferred to Klimenko's expertise as an experienced real estate agent, trusted him and regarded him as a loyal family friend; (2) was a retired mechanic with a high school education, who had very limited experience in real estate and was naive and unsophisticated; (3) did not fully understand the terms of the sale or documents he signed; (4) was primarily concerned about securing a source of income to cover his mother's expenses, and the idea of a regular income stream for the rest of her life appealed to him; and (5) was assured by Klimenko that the terms were beneficial for him and his mother because they needed to limit Theodosia's income to maintain her future Medi-Cal eligibility.

On June 17, 2005, Olague and Klimenko signed the various real estate purchase documents for the Tilmont property before Elena Vanegas, a notary public. Vanegas had been an escrow officer since 1992, and operated La Costa Escrow. She rented space in a commercial building in Downey owned by Klimenko (Downey property). Vanegas had handled many escrows for Klimenko. She did not open an escrow for Klimenko's purchase of the Tilmont property. On June 17, 2005, after Olague provided her a "'Statement of lnformation,'" Vanegas notarized the signed deed of trust, grant deed and certification of trust. Those documents, together with the purchase agreement and promissory note were delivered to a title company. On June 22, 2005, the title company processed the documents and recorded the grant and trust deeds without a formal escrow, concluding the sale.

Klimenko moved onto the property, and made monthly interest payments of $1,570.83 to Olague from July through December 2005. Klimenko's checks each contained "Tilmont" on the memo line.

4

*Klimenko sells the property to Martinez*

In fall 2005, Michael and Susan Claburn, holders of a third trust deed on Klimenko's Downey property demanded payment on their note of $50,000, and threatened to foreclose. Klimenko decided to sell the Tilmont property, in part, to generate funds to pay off notes and clear secured interests on the Downey property. In addition to Michael and Susan Claburn, Klimenko owed $183,852.57 to Beuford and Renata Claburn, who held a second trust deed on the Downey property.

Klimenko sold the Tilmont property to Martinez. On November 9, 2005, Vanegas opened an escrow. On November 14, 2005, Vanegas prepared escrow instructions specifying a purchase price of $360,000, with payment of $288,000 secured by a first trust deed, and payment of $72,000 secured by a second trust deed. The escrow instructions do not reflect that Martinez paid any deposit or earnest money.

On November 22, 2005, on behalf of Klimenko and in order to clear title to the Tilmont property, Vanegas sent Olague a letter requesting delivery of the June 2005 $290,000 promissory note and deed of trust. The letter did not mention Klimenko's sale of the Tilmont property to Martinez.

On December 27, 2005, Vanegas notarized a second deed of trust by Martinez in the amount of $72,000 in favor of Countrywide Home Loans Inc. (Countrywide), securing an interest in the Tilmont property. On December 29, 2005, Vanegas notarized a grant deed by Klimenko to Martinez for the Tilmont property, and a first deed of trust by Martinez for $288,000 in favor of Countrywide to secure an interest in the Tilmont property.

On January 4, 2006, Vanegas notarized a full reconveyance by Olague, releasing his first trust deed for the Tilmont property. At Vanegas's request, Olague also returned Vanegas's November 2005 letter requesting the note and reconveyance, and the original promissory note from Klimenko for his purchase of the Tilmont property in June 2005. On January 4, 2006, Vanegas notarized a second trust deed, dated June 14, 2005, by Klimenko in the amount of $290,000 in favor of Olague, ostensibly securing an interest in Klimenko's Downey property.

On January 5, 2006, Vanegas caused to be recorded the grant deed, Countrywide's first and second deeds of trust and the reconveyance, and closed the escrow for Klimenko's sale of the Tilmont property to Martinez. The second deed of trust from Klimenko in favor of Olague for the Downey property was never recorded. The escrow settlement statement prepared by Vanegas on January 5, 2006 shows in relevant part that Martinez paid no money into escrow, and that the lenders paid $360,000 into escrow, $242,145.33 of which was allocated to Klimenko (consisting of all escrow and closing fees including Martinez's share, $183,852.57 to Beuford and Renata Claburn and $50,000 to Michael and Susan Claburn). Klimenko received the balance of $117,854.67 from the $360,000 in cash.

At trial, Klimenko and Martinez each testified that Martinez was an independent, bona fide purchaser of the Tilmont property, that Martinez lacked knowledge of the transaction between Olague and Klimenko, and that Martinez purchased the Tilmont property in good faith and planned to live there and pay for the property without Klimenko's involvement. The trial court did not find this testimony credible. Instead, the court found that: (1) Martinez was Klimenko's pawn, who purchased the Tilmont property at Klimenko's direction and obtained financing for the purchase with Klimenko's help; (2) Martinez paid no money to purchase the property; (3) Klimenko remained involved with the Tilmont property after Martinez's purchase, in that he stored a vehicle in the garage, lived with Martinez on the property and paid him money, and assisted Martinez in trying to avoid foreclosure after he defaulted on his loans. The court found Martinez was not a bona fide purchaser for value.

Klimenko testified that: (1) he fully advised Olague about the terms of the sale to Martinez, and gave Olague a new promissory note for $290,000 relating to the Downey property; (2) Olague willingly and knowingly released his promissory note and security interest in the Tilmont property by signing and delivering the reconveyance to Vanegas; (3) knew, understood and willingly agreed that Klimenko would transfer his security interest from the trust deed for Tilmont property to the second trust deed for the Downey property; (4) knew, understood and willingly agreed that Klimenko would substitute the

promissory note for the Tilmont property with the new promissory note for the Downey property; and Olague received valuable consideration for the transaction. The court rejected this testimony.

Instead, the court found credible Olague's testimony that: (1) he had not known about Klimenko's sale of the Tilmont property to Martinez; (2) Klimenko did not explain the content or meaning of the reconveyance to him; (3) he did not knowingly agree to release the security interest in the Tilmont property; (4) he did not knowingly accept a security interest in the Downey property; (5) he did not intend to modify the original agreement with Klimenko as to the Tilmont property; (6) he did not understand the reconveyance letter from Vanegas or the reconveyance instrument; and (7) he never received nor was he aware of Klimenko's promissory note and second trust deed for the Downey property.

The trial court found that Klimenko: (1) misrepresented the terms of reconveyance for the Tilmont property; (2) needed to sell the Tilmont property in order to generate funds to repay the Claburns who were threatening to foreclose on the Downey property; (3) never gave the promissory note or second trust deed for the Downey property to Olague; (4) had two versions of the promissory note for the Downey property, neither of which was legitimate and neither of which were ever given to Olague; and (5) never intended to record Olague's second trust deed for the Downey property. The court further found that Olague signed the reconveyance and surrendered the promissory note for the Tilmont property under the mistaken understanding that Klimenko would continue making payments and that Olague maintained a security interest in the Tilmont property. Both the purchase agreement and promissory note for the Tilmont property stated that the entire principal was due upon sale or alienation of the Tilmont property. The trial court found that Klimenko deliberately defrauded Olague of the benefits of this provision, and deliberately concealed from Olague his sale of the Tilmont property to Martinez in order to avoid his obligation to pay the principal.

Klimenko claimed that he provided Olague valuable consideration in exchange for Olague's reconveyance and release of his security interest in the Tilmont property, and

7

that Olague received the promissory note and second trust deed for the Downey property. However, a couple of days after January 5, 2006, Klimenko was reminded that he had been enjoined him from encumbering the Downey property by the family court overseeing his marital dissolution proceeding. Klimenko explained this dilemma to Olague, who agreed that Klimenko need not record the second trust deed for the Downey property. Again, the court found Klimenko not credible. The court concluded that the transaction between Klimenko and Olague regarding the Downey property was a sham, that Klimenko obtained Olague's release of his security interest in the Tilmont property by fraud, and that Klimenko never intended to provide Olague with an enforceable security interest in the Downey property. Indeed, Klimenko knew a second trust deed on the Downey property was worthless because of the restraining order in his divorce proceeding, and knew on January 4, 2006 that he was prohibited from encumbering the Downey property with a second trust deed in favor of Olague.

Olague testified that he never signed the reconveyance for the Tilmont property, and that his signature had been forged. The court rejected this testimony The court also rejected Olague's contention that when he signed the reconveyance on January 4, 2006, he was tricked into signing a completely different document than the one he meant to sign. However, the court did find that Klimenko made misleading representations about the documents Olague signed on January 4, 2006 and that he concealed from Olague important information about his transaction with Martinez. The court also found that Olague had not understood the import of the reconveyance documents he signed and delivered to Vanegas on January 4, 2006, and that Vanegas told Olague he was signing documents relating to the Tilmont property, and that Olague carelessly failed to read or understand those documents before signing and delivering them to Vanegas. Although Olague knew the general nature of the documents he signed on January 4, 2006, Klimenko misled him about their meaning, effect and importance.

*Events after Klimenko's sale of the Tilmont property to Martinez*

Even after he sold the Tilmont property to Martinez, Klimenko continued to make monthly payments of $1,570.83 to Olague from January 2006 through November 2007.

8

Just as he had done before the sale to Martinez, Klimenko continued writing "Tilmont" on the memo line of each check. The trial court found that by concealing his sale of the Tilmont property and giving Olague the false impression that Klimenko was abiding by the original agreement, Klimenko avoided the obligation to pay the principal balance due upon sale.

In 2007, Theodosia's health worsened and it became necessary to move her to a skilled nursing facility. In ostensible accordance with the terms of the Tilmont property purchase agreement, which Olague mistakenly believed gave him the right to increase payments if Theodosia's expenses increased, he asked Klimenko to increase his monthly payments. Klimenko agreed and, in December 2007, began paying Olague $2,600 per month. Olague and Klimenko agreed that $1,029.17 (the amount in excess of the interest-only payment of $1,570.83) would be applied to the principal due on the note. Klimenko agreed to this arrangement even though no obligation for the increased payments existed under the $290,000 promissory note for the Downey property. Klimenko paid Olague $2,600 per month from December 2007 through September 2008. Klimenko continued to include the notation "Tilmont" on his checks to Olague. Again, the trial court found that by giving Olague the false impression that he continued to abide by the original Tilmont agreement, and by agreeing to increase his monthly payments after Theodosia's expenses increased, Klimenko concealed the sale of the Tilmont property and avoided his obligation to pay the principal balance.

In summer 2008, Klimenko began having difficulty paying $2,600 per month and fell behind in his payments to Olague. From October through December 2008, Klimenko resumed paying Olague interest-only monthly payments of $1,525.38. Because of the financial strain caused by Theodosia's increased expenses, and Klimenko's financial troubles, Olague applied for Medi-Cal benefits for Theodosia. That application was approved in November 2008. After receiving the Medi-Cal approval, Olague agreed to resume accepting interest-only payments on Klimenko's obligation under the promissory note for the Tilmont property. After discussing the matter, Olague and Klimenko agreed the principal balance was $280,534.24, and that Klimenko's interest-only payment on

9

that balance would be $1,519.56 per month. Klimenko made monthly interest-only payments of $1,519.56 from January through July 2009, and continued noting "Tilmont" on each check. The trial court found this constituted further evidence that Klimenko concealed his sale of the Tilmont Property to Martinez and avoided his obligation to pay the principal upon sale, by giving Olague the false impression that he was still abiding by the original Tilmont agreement.

Theodosia passed away in February 2009. On April 20, 2009, Olague notified Klimenko of her death and demanded payment of the remaining principal due under the note and deed of trust for the Tilmont property. In response, Klimenko did not disclose his sale of the Tilmont property to Martinez. Rather, in letters written in May, June and July 2009, Klimenko observed that real estate values had declined, enclosed comparable sales data for the Tilmont property and asked Olague to modify the original agreement. Olague refused that request. Klimenko made his last payment to Olague on July 7, 2009.

By early August 2009, Olague had consulted an attorney regarding the transaction with Klimenko. Only then did Olague learn that in January 2006 Klimenko had transferred the Tilmont property to Martinez and had obtained Olague's signature on a reconveyance releasing his secured interest in the Tilmont property.

*Martinez defaults on the Tilmont property*

In 2009, Martinez fell behind on his loan payments for the Tilmont property. A notice of default was served on Martinez and recorded against the Tilmont property on June 30, 2009. On October 14, 2009, Martinez was served with a notice of trustee's foreclosure sale which was recorded against the Tilmont property. To avoid foreclosure Martinez executed and recorded grant deeds, conveying a one-eighth interest in the Tilmont property to five fictitious individuals. Both Martinez and Klimenko testified that Klimenko was not involved in the transfers, which Martinez claimed he made at the direction of a paralegal. The court did not find this testimony credible. The court found "compelling evidence" that Klimenko and Martinez worked together to make and record these fictitious transfers, in part because Klimenko had employed the same ruse for a property he owned. To avoid foreclosure of a property in Compton, Klimenko had

10

executed and recorded grant deeds, conveying a one-eighth interest to four fictitious individuals. The deeds from Martinez and Klimenko shared key things in common: all the deeds conveyed a one-eighth interest; three deeds were prepared on the same date and used the same grantees; and the same notary was used for all of Klimenko's deeds and three of Martinez's deeds. Further, at trial, neither Martinez or Klimenko could identify the paralegal they claimed to have used. When asked by the court to explain the multiple common features of the two sets of deeds, Klimenko responded that the commonalities were merely "coinciden[tal]." The court found the testimony by Klimenko and Martinez was "false and deliberately misleading," reflected "consciousness of guilt by Klimenko" and constituted "evidence that Martinez was not a bona fide purchaser for the Tilmont property."[2]

## PROCEDURAL BACKGROUND

Olague, in his capacity as successor trustee of the trust, filed the instant action on August 17, 2009. In pertinent part, the second amended complaint (SAC) alleged four causes of action jointly against Klimenko and Martinez for quiet title, declaratory relief, cancelation of instrument and injunctive relief. The SAC also alleged causes of action against Klimenko alone for breach of contract, breach of fiduciary duty and fraud. In September 2010, the trial court overruled a demurrer on grounds of uncertainty by Klimenko to all causes of action except the claim for breach of fiduciary duty, which the court sustained and gave Olague leave to amend. Olague did not amend the claim. Instead he voluntarily dismissed that claim in October 2010.

After receiving leave of court to do so, Olague filed the operative third amended complaint (TAC). As relevant here, the TAC realleges causes of action against Klimenko and Martinez for declaratory relief, and a cause of action for fraud against Klimenko.

---

[2] Countrywide's interest was transferred to its successor in interest, defendant Bank of New York Mellon (Mellon, not a party to this appeal). The court found Mellon was a bona fide encumbrancer for value, a conclusion not at issue here.

After a bench trial, the trial court found in favor of Olague on the fraud claim. The court awarded damages of $280,534.24, plus prejudgment interest, punitive damages of $70,000, and costs and attorney fees. The court also found in favor of Olague on the cause of action for declaratory relief, declaring that Martinez was not a bona fide purchaser of the Tilmont property and that Olague's interest in that property was superior to Martinez's interest, but inferior to Mellon's. All remaining claims were dismissed. Klimenko and Martinez filed this timely appeal.

## DISCUSSION

*1.      Klimenko's appeal*

*a.      Res judicata/collateral estoppel*

Klimenko argues the judgment in favor of Olague as to the TAC's fraud cause of action is barred by res judicata or collateral estoppel by virtue of the trial court's sustaining of his demurrer to, and Olague's subsequent dismissal of, the cause of action for breach of fiduciary duty in the SAC. Klimenko is mistaken.

Res judicata prohibits the relitigation of claims and issues adjudicated in an earlier proceeding. The doctrine has two components. In its primary aspect res judicata (claim preclusion), operates to bar "relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.) The secondary aspect of collateral estoppel (issue preclusion), does not operate to bar a second action. Rather, it "'precludes relitigation of issues argued and decided in prior proceedings.' [Citation.]" (*Ibid.*; *Kelly v. Vons Companies, Inc*. (1998) 67 Cal.App.4th 1329, 1335.) Whereas res judicata bars a claim that could have been raised in earlier litigation, whether or not the claim actually was raised (*Mycogen Corp.*, at pp. 896–897; *Torrey Pines Bank v. Superior Court* (1989) 216 Cal.App.3d 813, 821), collateral estoppel bars only those issues actually and necessarily

12

decided in prior litigation.[3]  (*People v. Garcia* (2006) 39 Cal.4th 1070, 1076–1077; *Kelly v. Vons Companies, Inc.*, at p. 1339.)  Neither doctrine applies here.

Res judicata applies only if the cause of action in the subsequent litigation is identical to that in the first.  (*Rice v. Crow* (2000) 81 Cal.App.4th 725, 734.)  The fraud claim asserted in both the SAC and TAC is a separate and distinct tort from the claim for breach of fiduciary duty that Olague unsuccessfully attempted to plead in the SAC, and then chose to abandon.[4]  (*Mata v. City of Los Angeles* (1993) 20 Cal.App.4th 141, 149.)  Klimenko demurred to the fiduciary duty count on the ground of uncertainty.  (Code Civ. Proc., § 430.10, subd. (f).)  In overruling Klimenko's demurrer as to all claims except the

---

[3] Specifically, "Collateral estoppel precludes the relitigation of an issue only if (1) the issue is identical to an issue decided in a prior proceeding; (2) the issue was actually litigated; (3) the issue was necessarily decided; (4) the decision in the prior proceeding is final and on the merits; and (5) the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding.  [Citation.]"  (*Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 82.)  An issue is actually litigated "'"[w]hen [it] is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined . . . ."'"  (*People v. Carter* (2005) 36 Cal.4th 1215, 1240, italics omitted.)

[4] The elements of a cause of action for fraud "'"are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."'  [Citation.]"  (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173.)

In contrast, a claim for breach of fiduciary duty does not require the elements of representation, falsity or intent to deceive.  To plead a cause of action for breach of fiduciary duty, a plaintiff need only show the existence of a fiduciary relationship, breach of a duty encompassed by that relationship, and damage caused by the breach.  (*Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101; *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 244.)  A fiduciary relationship is one in which one person reposes trust and confidence in another person to act in the utmost good faith on his or her behalf, and the other person solicits or accepts that role.  (*Herbert v. Lankershim* (1937) 9 Cal.2d 409, 483; *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 29–30.)  "'[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.'"  (*Apollo Capital Fund*, at p. 246.)

fiduciary duty claim, the trial court aptly observed that the difficulty with Olague's breach of fiduciary duty claim was his failure to plead facts giving rise to a confidential relationship or continuing duty on the part of Klimenko. Although a real estate agent typically stands in a fiduciary relationship to his client, that was not the case here. According to their written agreement, Klimenko never stood in a representative capacity to Olague. Rather, the parties expressly agreed the Klimenko was the buyer in the sale of the Tilmont property. Olague relied on Klimenko and trusted him as a family friend. But "[t]he mere placing of a trust in another person does not create a fiduciary relationship." (*Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 13; *Ampuero v. Luce* (1945) 68 Cal.App.2d 811, 819.) The claim for intentional fraud adjudicated at trial, does not require that a confidential relationship or continuing duty be shown, was not barred by res judicata. (Cf., *Rice v. Crow*, at p. 734.) For the same reasons we also find the fraud claim was similarly not barred by collateral estoppel.

Further, collateral estoppel would apply only if issues resolved by the trial court's ruling on the demurrer were identical to those raised at trial. (See *Zevnik v. Superior Court*, *supra*, 159 Cal.App.4th at p. 82.) If it applied here the doctrine would relate only to issues related to Olague's claim that Klimenko acted as his fiduciary in connection with the reconveyance, and breached that duty by misrepresenting the import of documents he had Olague sign in order to avoid his obligation to pay on the installment note. When it sustained the demurrer to the fiduciary duty claim in the SAC, the court observed that it "[had] no idea on what basis [Olague was] claiming some fiduciary duty on behalf of Mr. Klimenko for a reconveyance that was executed one year after the property was sold. You have to have some sort of continuing duty or something like that, and [the court didn't] see it." Given that no fiduciary duty existed as to the initial sales transaction, the court was hard-pressed to ascertain how such a duty could later attach to Klimenko. Nevertheless, Olague was given leave to amend to attempt to plead a viable claim. Because Olague then chose to dismiss rather than to amend the fiduciary duty claim, no answer was filed and no affirmative defenses regarding the existence, if any, of Klimenko's duty as a fiduciary were ever pleaded. Accordingly, no issue raised in the

14

SAC related to Klimenko's alleged breach of fiduciary duty was actually litigated or necessarily decided. The doctrine of collateral estoppel is therefore not applicable. (*Ibid*.) Res judicata did not bar the fraud claim.

2. *Fraud judgment*

Klimenko also argues the judgment for fraud must be vacated because there is no evidence that he gave Olague any information at all regarding the reconveyance transaction, let alone that he made intentionally false representations.

To establish a claim of intentional misrepresentation, the plaintiff must provide proof of knowingly false representations by the defendant, the defendant's intent to deceive the plaintiff, the defendant's intent for the plaintiff to rely on the representations, reasonable reliance by the plaintiff, and damages resulting from plaintiff's reliance on the false representations. (*Engalla v. Permanente Medical Group* (1997) 15 Cal.4th 951, 974; CACI No. 1900; Civ. Code, §§ 1709–1710.) Here, the court found each of these "elements . . . clearly established by the evidence." Specifically, the record reflects and the court found that:

" . . . Following the sale of the Tilmont Property in June 2005, Olague had valuable property: a $290,000 promissory note from Klimenko and a trust deed in the Tilmont Property which secured this debt. In January 2006 Klimenko defrauded Olague into surrendering the note and releasing the secured interest. Klimenko misrepresented the terms of the reconveyance for the Tilmont Property and concealed his sale of the Tilmont Property to Martinez. Olague was entitled to the principal of the promissory note upon sale of the Tilmont Property, but he received nothing. After Olague demanded payment of the note upon the death of his mother, Klimenko revealed in July 2009 that he had sold the Tilmont Property and produced a promissory note and second trust deed for his Downey Property—which were never legitimate instruments and never had any value because of a marital dissolution order that prevented Klimenko from encumbering the Downey Property.

"Klimenko has argued that the evidence does not establish reasonable reliance, because Olague carelessly signed the reconveyance for the Tilmont Property and was told

15

by Vanegas that he would not receive any money before he did so. The court does not accept this argument; as it ignores Olague's naiveté, his misplaced confidence in Klimenko, and the law. Olague had never sold any real property before June 2005, and his only experience with real property transactions were the purchase of his own home in 1964 and the refinancing of his home over the years—all of which involved the direction and assistance of an agent or mortgage broker. Olague viewed Klimenko as a trusted friend of his family, who had guided him through the sale of his mother's home in June 2005, and was reliably paying interest that supported his mother.

"Under these circumstances, Olague's reliance upon Klimenko was reasonable. Klimenko engaged in willful and intentional fraud, and as the Supreme Court held in *Seeger v. Odell* (1941) 18 Cal.2d 409, 414–415, 'Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent. As a general rule negligence of the plaintiff is no defense to an intentional tort. The fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar his recovery . . . .' (citations omitted). Accord *Smith v. Williams* (1961) 55 Cal.2d 617, 620 ('Even negligence on the part of plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional, as alleged here, rather than negligent.'); *Manderville v. PCG & S Group*[*, Inc.*] (2007) 146 Cal.App.4th 1486, 1503 ('It is well established in California that in an action for fraud or deceit, negligence on the part of the plaintiff in failing to discover the falsity of the defendant's statement is no defense when the misrepresentation was intentional.')."

Klimenko maintains here, as he did at trial, that there is no evidence he gave Olague any information regarding the deed of reconveyance, let alone that he made direct or false representations in connection with that transaction. The trial court specifically rejected this argument, as well as all testimony presented by Klimenko and Martinez. The court acknowledged that "Olague . . . could not remember what Klimenko said to him during that transaction." That, however, did not end the inquiry. The court found

16

that Olague's naive and misplaced reliance was easily inferred from circumstances surrounding his dealings with Klimenko. Specifically, the court found that:

" . . . [T]here is ample evidence from which to infer that Klimenko made deliberately false representations that caused Olague to sign the reconveyance and deliver the promissory note for the Tilmont property. It is well established that circumstantial evidence may support a finding of fraud. (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 814 ('The rule in this state and elsewhere is that it is not necessary to show reliance upon false representations by direct evidence. Reliance may be inferred from the circumstances attending the transaction which oftentimes afford much stronger and more satisfactory evidence of the inducement which prompted the party defrauded to enter into the contract than his direct testimony to the same effect'); *Palmquist v. Mercer* (1954) 43 Cal.2d 92, 100 ('Actual fraud is a question of fact (Civ. Code, § 1574); and like any other fact, it may be proved by circumstantial evidence.'); *McNulty v. Copp* (1949) 91 Cal.App.2d 484, 490 (same).)"

We reject Klimenko's assertion that the court erred in concluding that Olague reasonably relied on Klimenko's representations, because "there is no evidence, circumstantial or otherwise, that . . . Klimenko, made false statements to [Olague] about the 'content and meaning' of the Deed of Reconveyance." The record reflects otherwise. The court rejected Olague's contention that he did not know the nature of the documents he signed in connection with the reconveyance, and was tricked into signing a document other than the one he meant to sign. However, although "Olague knew the general nature of what he signed on January 4, 2006, . . . Klimenko misled him about the meaning, effect and importance of the documents . . . ." Specifically, based on facts presented at trial, the court found "that Klimenko made misleading statements about the [reconveyance] documents signed on January 4, 2006 and concealed important facts about his transaction with Martinez; that Olague did not understand the meaning and effect of the reconveyance . . . and reconveyance letter . . . that he signed and delivered to Vanegas on January 4, 2006; that on January 4, 2006 Vanegas advised Olague that he was signing documents which related to the Tilmont Property, which is particularly

17

evident from the reconveyance letter . . . ; and that Olague was careless in failing to read and understand the reconveyance . . . and reconveyance letter . . . before he signed and delivered them to Vanegas." Viewed in its entirety, the record provides ample evidence to support the court's conclusion that Klimenko intentionally misled Olague to participate in a sham transaction, and that under the circumstances, Olague's misplaced reliance on Klimenko's misrepresentations was reasonable, and that Olague's own negligence in failing to discover the falsity of Klimenko's representations did not provide Klimenko a defense for his own intentional misdeeds.[5] (*Manderville v. PCG & S Group, Inc.*, *supra*, 146 Cal.App.4th at pp. 1502–1503.)

3.    *Martinez's appeal*

      a.    *Declaratory relief was appropriate*

Martinez maintains there is no legitimate basis for liability against him because "[t]here was no evidence that [he] and [Klimenko] ever communicated with each other or ever new [sic] of each other's existence," and the "uncontroverted evidence and finding by the trial court was that Martinez bought [the Tilmont property] with his own financing from Mellon Bank." Martinez must have other litigation in mind; the evidentiary record from *this* trial is completely at odds with both these statements.

First, the trial court found the evidence at trial showed Martinez was not a bona fide purchaser for value. On the contrary, acting at Klimenko's direction and with his help, Martinez "purchased the Tilmont Property . . . [and] . . . obtained financing for the purchase," for which Martinez "paid no money." Second, Martinez and Klimenko were

---

[5] Klimenko also argues that he had no duty to explain the "legal effect" of the reconveyance to Olague and that, had he done so, he would have been engaging in the unauthorized practice of law. Even if we assume this is correct, it would not excuse Klimenko from purposefully and for his own gain tricking Olague into participating in a transaction in which Klimenko never intended to provide him the promised security interest, and in which he knew the second trust deed he provided but never meant to record was worthless (because of his divorce litigation), but concealed important facts so Olague believed he signed documents related to the Tilmont property.

18

clearly in close communication. After Martinez's sham purchase of the Tilmont property was completed, "Klimenko continued to be involved with the Tilmont Property . . . by storing his vehicle in the garage, living at the property with Martinez, paying money to Martinez, and assisting Martinez in attempting to avoid foreclosure after he defaulted on his loans." The trial court found that Olague demonstrated an entitlement to declaratory relief against Martinez. The trial court noted, however, that the issue may have become moot by the time of trial because Martinez had defaulted on the loan and was facing imminent foreclosure. Nevertheless, as a protective measure for Mellon, a bona fide encumbrancer, the court granted declaratory relief against Martinez.

Declaratory relief actions promote judicial economy, proving litigants a quick, efficient means to resolve disputed issues. Under the declaratory judgment act (Code Civ. Proc., § 1060 et seq.), a party may seek a declaration of rights or duties and the court may make a binding declaration of these rights. Unlike coercive relief (such as damages, specific performance, or an injunction) which requires a party to do or to refrain from doing something, a declaratory judgment merely declares the parties' legal relationship. A party may seek declaratory relief to establish his or her rights once a conflict had arisen, or as a prophylactic measure before a breach occurs. As explained in *Lortz v. Connell* (1969) 273 Cal.App.2d 286, 301, "[t]he salutary purpose of the declaratory relief provisions is to permit a prompt adjudication of the respective rights and obligations of the parties in order to relieve them from uncertainty and insecurity with respect to rights, status and other legal relations. [Citation.] It enables a party to get a prompt adjudication without a dispute over the damages suffered."

Courts are vested with broad latitude in formulating declaratory judgments. (*City of L.A. v. City of Glendale* (1943) 23 Cal.2d 68, 81; *Fowler v. Ross* (1983) 142 Cal.App.3d 472, 478.) That is because the purpose of a judicial declaration is to "enable the parties to shape their conduct to avoid" a prospective breach, not merely to redress past wrongs. (*Babb v. Superior Court* (1971) 3 Cal.3d 841, 848.) We review a grant of declaratory relief for abuse of discretion. (*Orloff v. Metropolitan Trust Co.* (1941) 17 Cal.2d 484, 489.)

19

Here the trial court appropriately found that Olague was entitled to declaratory relief to clarify his interest, if any, in the Tilmont property vis-à-vis Martinez. Although this issue may have become moot because of Martinez's default and an impending foreclosure, the court properly granted relief to clarify its conclusion that "Martinez [was] not a bona fide purchaser of the Tilmont Property and that Olague's interest in the property [was] superior to Martinez but inferior to Mellon."

      *b.     Attorney fees*

Martinez also argues that "there is no basis for recovery of attorney's fees against" him. He is correct. In all likelihood, that is why the trial court did not make an attorney fees award against him. Rather, the court ordered that as a losing party, Martinez was responsible for court costs. Code of Civil Procedure section 1033.5 allows attorney fees to be awarded as costs in certain actions. (See Code Civ. Proc., § 1033.5, subd. (a)(10)(A)-(C) [authorizing attorney fees award as costs if authorized by statute, contract or law]; see also subd. (c)(5).) That statute does not apply here. Court costs were properly assessed against Martinez, who did not prevail in this action.

## DISPOSITION

The judgment is affirmed.  Edward H. Olague, Sr., as trustee, is awarded costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.