Filed 8/23/16  Soin v. Sger CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RAKESH SOIN, | C071206 |
| Plaintiff and Respondent, | (Super. Ct. No. 34200900046833CUBCGDS) |
| v. | |
| NASSER SGER, | |
| Defendant and Appellant. | |

In this action for fraud and breach of a contract regarding the sale of a Wienerschnitzel restaurant franchise, seller and defendant Nasser Sger appeals from a judgment against him entered after a nonjury trial awarding buyer and plaintiff Rakesh Soin compensatory and punitive damages.  The trial court found that prior to the close of escrow Sger intentionally failed to disclose a pending lawsuit filed by restaurant patron Jean Riker (Riker lawsuit) alleging that the franchise premises violated the Americans with Disabilities Act (ADA).

1

On appeal, Sger contends Soin failed to sufficiently prove that Soin performed all of his contractual obligations, that Soin failed to prove he justifiably relied on Sger's failure to disclose the Riker lawsuit, and that Soin failed to prove he suffered any damages. Sger further argues the court erred in permitting Soin's uncle, Bal Soin, to testify at trial because Soin never disclosed him as a potential witness during pretrial discovery.

Finding no merit to Sger's contentions, we affirm the judgment.

FACTS AND PROCEEDINGS

*The Parties and the Wienerschnitzel Franchise*

The Galardi Group Franchise and Leasing, LLC (Galardi), franchises Der Wienerschnitzel fast food restaurants in California. Sger is in the restaurant business and has owned and operated several restaurants over the years, including the Wienerschnitzel franchise at issue here, which is located at 2501 Broadway in Sacramento (the franchise).

Sger purchased the franchise in 1994. His wife, Rula Khatib, owns the underlying land. In the summer of 2005 Sger decided to sell the franchise. Although no listing agreement was ever produced during trial, he claimed he listed the franchise with a broker for $450,000. He received a few responses but none were for the asking price.

Soin and his family also worked in the restaurant business. Years before, Soin had owned and later sold a Wienerschnitzel franchise. Soin's uncle, Bal Soin, had over 30 years of experience in running Wienerschnitzel franchises. We note that, because the plaintiff and his uncle, Bal Soin, share the same surname, we refer to Bal Soin herein by his full name for clarity.

Bal Soin owned two Wienerschnitzel franchises and was the president of the local franchise association. As a franchise owner, Bal Soin would often attend monthly meetings with other Wienerschnitzel franchisees in the Sacramento market area. Bal

2

Soin learned that Sger was interested in selling the franchise at one of the monthly franchisee meetings.

*The Riker Letter*

Restaurant patron Jean Riker visited the franchise on July 1, 2005. While there she attempted to use the restroom, but was unable to transfer from her wheelchair to the toilet due to accessibility issues. She wrote a letter to the franchise manager describing her complaints (Riker letter). Citing the ADA, she requested a response by July 31, 2005, outlining plans to make the franchise ADA accessible.

After receiving the Riker letter, Sger faxed it to his attorney. Sger did not respond to the letter, nor did he have the property inspected for potential ADA violations at that time.

*The Galardi Restaurant Resale Evaluation*

In October 2005, Galardi conducted a Restaurant Resale Evaluation (Galardi Report) of the franchise, which identified deferred maintenance items and upgrades totaling approximately $155,000 that were necessary before Galardi would approve a franchise sale and transfer. Several of the listed items related to the ADA, including slurry coating and restriping the parking lot, redoing the wheelchair ramp, and upgrading the restrooms with new tile, paint, door kick plates, toilets, sinks, and mirrors.

In December 2005, Galardi sent Sger a copy of the Galardi Report together with a cover letter stating, "In addition to the resale requirements listed above, Galardi Group requires you to have an ADA (Americans with Disabilities Act) inspection, by a reputable ADA consultant, of the referenced restaurant. Note that you are legally responsible for the correction of items stated in the inspection that do not comply with the ADA or any similar state accessibility laws. A copy of such ADA inspection must be given to the escrow company handling your resale prior to the close of escrow." The

body of the report itself contains nearly identical language, which the trial court referred to as the "inspect and correct clause."

*The Purchase Agreement and Escrow Instructions*

In early 2006, Bal Soin told his nephew that Sger wanted to sell the franchise. Soin then contacted Sger to inquire about buying the franchise. Soin, Sger, and Bal Soin met about three times to discuss Soin purchasing the franchise. Sger's wife was also present during some of the meetings.

On February 21, 2006, Soin and Sger executed a standard California Association of Realtors (CAR) Business Purchase Agreement and Joint Escrow Instructions (Purchase Agreement) for the franchise. Bal Soin filled in the form with the figures and terms supplied by Soin and Sger.

Under the Purchase Agreement, Soin agreed to pay Sger a reduced price of $300,000 for the franchise and to do the remodeling work identified in the Galardi Report. The Purchase Agreement provides in relevant part, "Buyer to do remodel improvements recommended by Galardi Group (Wienerschnitzel) at Buyer expense." Thus, in addition to depositing the $300,000 purchase price in escrow Soin also deposited a separate $155,000 to cover the renovations recommended in the Galardi Report. Galardi controlled the $155,000 and would periodically release funds to reimburse either Soin or a contractor as the work was completed. Sger had no control over the $155,000.

The Purchase Agreement also includes a paragraph advising the buyer and seller to contact a qualified professional to determine the ADA impacts in the transaction. Neither Soin nor Sger did so.

Paragraph 19 of the Purchase Agreement, entitled "Notices of Violations," states: "Seller represents that, to the best of Seller's knowledge, no notices of violations of federal, state or local statute(s), law(s) or regulation(s) exist, or are filed or issued, that affect the operation of the Business, including any such notices regarding the real

4

property in which the Business is situated ("Notices"), EXCEPT: _____. If prior to Close of Escrow, Seller receives or becomes aware of any Notices filed against or affecting the Business, Seller shall immediately notify Buyer." Nothing was written on the blank line.

Escrow was originally set to close in April 2006, but the closing was delayed for financing reasons until June 5, 2006. Soin asked Sger if he could begin operating the franchise prior to the close of escrow, but Sger refused.

On June 2, 2006, Soin showed Sger a handwritten document entitled "Buyer Instruction to Escrow Before Closing," which had been drafted by his uncle. Soin asked to include the document as part of the escrow instructions and Sger agreed. Sger's wife was also shown the proposed written instructions and she told Sger to include it in the escrow.

The written escrow instructions included the following terms: "(1) Lease must be signed and delivered from Seller[;] (2) All equipment should be in working order otherwise credit should be given to buyer for repairs[;] (3) Any law suit [sic] prior will be responsibility of Seller." Bal Soin testified he drafted the written escrow instruction and that it was his idea to refer to prior lawsuits based on a bad business experience he had in buying a gas station. He said he was not aware of the Riker lawsuit (see *post* at page 6) when he drafted the instruction, and that had he known of the lawsuit, he would have referred to it by name in the instruction.

Escrow closed a few days later. Soin and Khatib executed a 15-year lease for the franchise property. Soin began operating the franchise and started work on the remodeling items listed in the Galardi Report. By December 2006 Soin had completed the Galardi Report repairs, and Galardi had released all of the $155,000 in escrow even though Soin had never obtained or submitted an ADA inspection report. Galardi approved a 10-year franchise agreement with Soin.

5

*The Riker Lawsuit and Settlement*

In April 2006, after the parties had executed the Purchase Agreement but before escrow closed, Riker filed a federal lawsuit (Riker lawsuit) against Sger, his wife, and the franchise for violating the ADA. The complaint alleged the restaurant lacked, among other things, accessible parking, travel pathways, entrances, and bathrooms. The restroom issues included lack of a transfer space and compliant grab bars, out of reach amenities, and obstructed floor space that prevented an appropriate wheelchair turning radius.

Sger's wife was served with the Riker lawsuit on May 2, 2006, at their home. She recognized it was important and sent it to their attorney. She claimed Sger told Soin about the Riker lawsuit right after they received it, testifying she joined a conversation between the two men at Sger's pizza restaurant in which the lawsuit was discussed. She later testified that the conversation took place after they received the Riker letter but before they were served with the Riker lawsuit.

Sger claimed he first found out about the Riker lawsuit towards the end of May 2006 when he visited the franchise to make sure things were running smoothly prior to the sale. According to Sger, Soin happened to stop by the restaurant the very same day he learned of the lawsuit. In Soin's presence, the manager handed Sger an envelope containing the Riker lawsuit and told him "we got served." Soin asked what it was, and Sger told him it was a "handicap" lawsuit. Sger said he would take care of the lawsuit.

Soin, on the other hand, denied that he was ever present at the franchise when the manager purportedly handed Sger the Riker lawsuit, and claimed that the event as described by Sger never occurred. Soin testified that he did not learn of the Riker lawsuit until July 2006, a month after escrow had closed, when he went to Sger's pizza restaurant to deliver the first rent check for the franchise. It was then that Sger told him, "we have a problem . . . we have a lawsuit." Sger also told him he would take care of the lawsuit.

Had Soin known of the pending Riker lawsuit, he would not have closed escrow on the sale.

Soin, as the new franchise owner, was added as a defendant in the Riker lawsuit in early 2007. Soin did not appear and Riker took his default. He did not pay any attorneys' fees related to the suit.

A few months later in May 2007, Sger's wife attended a settlement conference and settled the Riker lawsuit on the remaining defendants' behalf. She agreed to pay Riker $55,000 and to correct the ADA deficiencies at the franchise within 100 days. She believed that Soin was responsible for doing the ADA repairs identified in the Riker lawsuit because he purchased the franchise and had promised to do the Galardi Report remodeling items. Khatib later procured an estimate of nearly $116,000 to fix the ADA violations alleged in the Riker lawsuit that she and Sger then tried to pressure Soin into doing. Soin did not undertake the ADA repairs outlined in the Riker lawsuit. He believed he had only agreed to do the Galardi Report repairs and not the repairs needed to satisfy the Riker settlement.

*Additional ADA Lawsuits*

In September 2007, Soin was sued under the ADA by George Louie. He paid Louie $3,333 to settle and another $1,500 in attorneys' fees.

In June 2008, Scott Johnson filed another action against Soin and Khatib alleging, like the Riker lawsuit, that the franchise premises violated the ADA. Soin paid $2,500 to settle the case and another $3,700 in attorneys' fees defending the action. Khatib also paid to settle the Johnson litigation.

*The Unlawful Detainer Action*

In October 2007, Khatib filed an unlawful detainer action (UD lawsuit) against Soin to evict him from the franchise property. Sger's complaint requested $179,176.76 in past-due rent, which was comprised of the following: (1) $116,098 in construction costs;

7

(2) $5,703 in attorney fees; (3) $2,375.76 in legal costs; and (4) $55,000 in ADA violations. She conceded the $116,000 construction cost figure came from the estimate she obtained to fix the ADA violations identified in the Riker lawsuit, and that the $55,000 figure was the same amount she paid to settle the Riker lawsuit. Soin successfully moved to quash the summons and Khatib did not pursue the matter further although the suit was technically still pending.

*Completion of the ADA Repairs*

In 2009, Soin paid to make the restrooms and an outside wheel chair access ramp ADA compliant. Among other things, Soin had to convert the men's and women's bathrooms into a single restroom, which required extensive structural construction work. Soin borrowed $10,000 from his uncle to pay for the repairs.

*Trial Proceedings*

In June 2009, Soin sued Sger for breach of contract, fraud, and negligent misrepresentation. The court granted Sger summary adjudication of the negligent misrepresentation claim, and tried the breach of contract and fraud causes of action in a bench trial. Those claims were based on Sger's alleged failure to disclose the Riker letter and the Riker lawsuit prior to the close of escrow. After hearing conflicting testimony from Soin, Sger, Khatib, and, over defendant's objection, Bal Soin, the court found in favor of Soin and against Sger on both counts.

The court's statement of decision found that Sger had a duty to disclose the Riker lawsuit before escrow closed and intentionally concealed the lawsuit from Soin thereby breaching the Purchase Agreement. The court also found Soin had sufficiently performed his contractual obligations. The court concluded that even if the Galardi Report, which was incorporated into the Purchase Agreement, required Soin to obtain an ADA inspection prior to the close of escrow and to fix whatever violations the inspection revealed, the provision was for Galardi's benefit and not Sger's, and Galardi had excused

8

Soin's performance of the provision. But even if the provision was also for Sger's benefit, the court found Sger waived the "inspect and correct" provision by closing escrow without Soin having obtained the required ADA inspection.

Soin was awarded $34,647.69 in damages, which included $10,449.29 in ADA-related repair expenses, $12,565.40 for defending the UD lawsuit, $5,433 in litigation expenses for the Louie litigation, and $6,200 to settle the Johnson litigation. The court also awarded Soin approximately $17,000 in punitive damages.

Judgment was entered on March 22, 2012, and later amended on August 6, 2012, to include specific amounts for attorneys' fees and prejudgment interest.

DISCUSSION

I

*Standard of Review*

The parties first dispute the applicable standard and scope of review on appeal. Sger urges the court to apply a de novo standard of review, arguing that apart from the Riker lawsuit disclosure issue no other disputed issues of fact were presented below. Soin, on the other hand, contends the substantial evidence standard of review applies. Soin has the better argument.

In a nonjury trial, like the one here, the trial court is required to render a statement of decision on the timely request of a party, explaining the factual and legal basis for its decision as to each of the principal controverted issues for which the statement was requested. (Code Civ. Proc., § 632.) The court issued a written statement of decision regarding liability and compensatory damages. The court also issued a separate statement of decision on punitive damages.

On appeal, the statement of decision provides a record of the trial court's reasoning on particular disputed issues, which the appellate court may review in determining whether the court's decision is supported by the evidence and the law. (*In re*

9

*Marriage of Ditto* (1988) 206 Cal.App.3d 643, 647.) A judgment or order of a lower court is ordinarily "presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.]" (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*).) Appellate courts independently review questions of law and apply the substantial evidence standard to a superior court's findings on questions of fact. (See *People v. Cromer* (2001) 24 Cal.4th 889, 893-894 [questions of law are subject to de novo review and questions of fact are reviewed under deferential substantial evidence standard].)

Generally, "[i]f the interpretation of [a] contract turns upon the credibility of extrinsic evidence, the interpretation of the contract is not a question of law, but one of fact and it will not be overturned unless not supported by substantial evidence." (*LaCount v. Henzel Phelps Constr. Co.* (1978) 79 Cal.App.3d 754, 770.) And whether a party has misrepresented or suppressed material facts amounting to fraud is always a question of fact. (See Civ. Code, § 1574; *Fowler v. Brown* (1954) 125 Cal.App.2d 450, 457 [" 'Misstatement or suppression of facts is not fraudulent unless motivated by an intent to deceive or to induce another to enter into a contract . . . or unless it amounts to a breach of duty . . . [t]he question of actual fraud is always one of fact' "].)

Here, the trial court considered extrinsic evidence on the meaning and import of various terms and provisions of the Purchase Agreement and escrow instructions. After listening to multiple witnesses testify about the parties' negotiations, the Purchase Agreement, and the written escrow instructions, the court found Soin and Bal Soin more credible than Sger or his wife. Because the trial court interpreted the meaning of the parties' contract in light of extrinsic evidence and also found that Sger had a duty to disclose the Riker lawsuit but intentionally failed to do so prior to the close of escrow, the substantial evidence standard governs. (*Fowler v. Brown*, *supra*, 125 Cal.App.2d at p. 457.) We must uphold the trial court's findings if any substantial evidence supports the court's decision.

Evidence is "substantial" for purposes of this standard of review if it is "of 'ponderable legal significance,' 'reasonable in nature, credible, and of solid value' . . . . [Citations.]" (*Grappo v. Coventry Financial Corp.* (1991) 235 Cal.App.3d 496, 507.) We view the evidence in the light most favorable to Soin as the prevailing party, giving Soin the benefit of every reasonable inference and resolving all conflicts in Soin's favor. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660; *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [substantial evidence rule].)

## II

### *Breach of Contract*

Sger contends the court erred in finding Soin adequately performed his contract obligations under the Purchase Agreement and that Soin proved he was damaged by Sger's failure to disclose the Riker lawsuit. According to Sger, the Purchase Agreement, which incorporated the Galardi Report, required Soin to obtain an ADA inspection of the franchise and to fix whatever the inspection revealed. (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1331(*Troyk*) [" ' "It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document" ' "].) Because Soin admitted he did not obtain the requisite ADA inspection, Sger argues he did not fully perform under the Purchase Agreement. And Soin could not have been damaged by eventually fixing the ADA violations because the Galardi Report required him to do so regardless of the Riker lawsuit settlement.

The trial court, however, found that the Galardi Report's "inspect and correct" clause was for the benefit of Galardi not Sger, and that Galardi waived performance of the provision. Reviewing the record as a whole and in the light most favorable to the judgment (*Arceneaux, supra,* 51 Cal.3d at p. 1133), we conclude the record amply supports the trial court's finding. (*In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 342 [" 'Where a statement of decision sets forth the factual and legal basis for the

11

decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision' "].)

It is well settled that a third party may acquire valuable rights under a contract between others even though he is not expressly named in the contract. (Civ. Code, § 1559.) " 'Where one person for a valuable consideration engages with another to do some act for the benefit of a third person, and the agreement thus made has not been rescinded, the party for whose benefit the contract or promise was made, or who would enjoy the benefit of the act, may maintain an action against the promisor for the breach of his engagement.' " (*Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225, 1232; see also *Shell v. Schmidt* (1954) 126 Cal.App.2d 279, 290.) "The promise in such a situation is treated as having been made directly to the third party." (*Shell, supra,* 126 Cal.App.2d at p. 290.) "Generally, it is a question of fact whether a particular third person is an intended beneficiary of a contract." (*Prouty, supra,* 121 Cal.App.4th at p. 1233.)

An intended third party beneficiary may also voluntarily waive or disclaim his rights under such a contract. (*Bass v. John Hancock Mut. Life Ins. Co.* (1974) 10 Cal.3d 792, 796 (*Bass*); *Stanley v. Robert S. Odell & Co.* (1950) 97 Cal.App.2d 521, 533.) The "burden is on the party claiming the waiver ' . . . to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver" [citation].' " (*Bass* at p. 796.)

In this case, Sger does not dispute that Galardi was an intended third party beneficiary of the Purchase Agreement but rather that no evidence shows Galardi waived the ADA inspect and correct clause. He further contends that the ADA inspection provision was also for his benefit and no evidence showed he waived or otherwise excused Soin's performance. We disagree.

Sger testified that he had absolutely no control over the $155,000 set aside in escrow for Soin to perform the Galardi remodel requirements. Once he was paid the $300,000 purchase price, he conceded he was finished with the franchise.

The uncontroverted evidence, moreover, established that Galardi alone controlled the $155,000 in escrow and released it to Soin or his contractors once it concluded that the remodel items had been completed to its satisfaction. It was also undisputed that by December 2006, Soin had sufficiently remodeled or replaced the items listed in the Galardi Report such that Galardi had released all of the $155,000 and had granted Soin a 10-year franchise agreement. Galardi did so without ever having requested or obtained an ADA inspection from Soin as the Galardi Report required. This evidence sufficiently establishes that the Galardi Report inspection requirement was intended to benefit Galardi and that Galardi waived the requirement under the Purchase Agreement as the trial court found. (*Bass, supra,* 10 Cal.3d at pp. 795-796 [third party who refused coverage under group insurance plan waived third party rights under the agreement].)

Even assuming Sger's contention is correct that the ADA inspect and correct clause was also for his benefit, the record shows Sger--like Galardi--waived Soin's nonperformance of the provision as the trial court concluded. "It is, of course, well settled that a contracting party may waive provisions placed in a contract solely for his benefit." (*Isaacson v. G.D. Robertson & Co.* (1948) 85 Cal.App.2d 71, 75.)

The Galardi Report expressly stated that the ADA inspection had to be completed prior to the close of escrow. Sger himself testified that the ADA inspection and repairs listed in the Galardi Report were supposed to be done before the close of escrow. Sger, however, refused to allow Soin to take possession of the franchise and begin operating it before escrow closed. Sger also closed escrow, accepted the $300,000 payment, and walked away from the franchise without requiring Soin to obtain the necessary ADA inspection report or complete any ADA-related repairs. Thus, to the extent the Galardi Report's ADA inspection provision was for Sger's benefit, substantial evidence supports

13

the trial court's finding that Sger voluntarily waived performance of the inspection by closing escrow without it.

Sger next argues that Soin failed to prove the breach--Sger's failure to disclose the pending Riker lawsuit--caused the repair expenses and litigation defense costs the trial court awarded as damages. In Sger's view, the Purchase Agreement and Galardi Report obligated Soin to investigate and repair at his own expense any ADA violations discovered in the required inspection. Had Soin obtained a proper ADA inspection like he was required to do, the inspection would have revealed the same ADA defects litigated in the Riker lawsuit. Because Soin already had a contractual duty to correct any such ADA deficiencies, the failure to disclose the Riker lawsuit, Sger argues, did not damage Soin in any way. We disagree.

"For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300; see also *Troyk, supra,* 171 Cal.App.4th at p. 1352.) The causation element requires the plaintiff to prove that he was harmed by the defendant's breach or that the defendant's breach was a substantial factor in causing the damage. (*Troyk* at p. 1353.) Here, the trial court awarded Soin $10,449.29 in permit and ADA repair costs, $12,565.40 in legal expenses related to defending the UD lawsuit, $5,433 to settle the Louie lawsuit, and $6,200 to settle the Johnson lawsuit. Substantial evidence supports the trial court's damages award.

As discussed above, the evidence showed both Galardi and Sger waived Soin's performance of the inspect and correct clause contained in the Galardi Report and incorporated into the Purchase Agreement. Once waived, Soin's nonperformance of the obligation cannot be raised as a defense. (*Boone v. Templeman* (1910) 158 Cal. 290, 294-295 [generally a party who waives performance of a contract provision intended for

14

his benefit cannot thereafter raise the nonperformance as a defense to a breach of contract claim].)

Soin also testified that had Sger properly disclosed the Riker lawsuit he would not have closed escrow on the franchise. In other words, he would have walked away from the deal. Because the Riker lawsuit was not properly disclosed, the sale closed and Soin later paid money to fix the ADA problems alleged in the Riker lawsuit. Sger's failure to disclose the lawsuit was, at a minimum, a substantial factor in bringing about those repair costs. (*Troyk, supra,* 171 Cal.App.4th at pp. 1352-1353.)

The evidence also established that Soin was never in arrears on any rent payments to Sger's wife, and that Sger's wife told him she was going to do something to make Soin pay for the ADA repairs she agreed to do in order to settle the Riker lawsuit. Thus, as the trial court found, the UD lawsuit was nothing more than a thinly-veiled attempt by Khatib and Sger to force Soin to pay for the ADA repairs that Sger and his wife had agreed to do as part of the Riker settlement. Soin was also forced to defend two additional ADA lawsuits from Louie and Johnson, which were filed after Sger and Khatib failed to timely fix the ADA violations settled in the Riker lawsuit. All of these expenses can be traced directly back to Sger's failure to disclose the Riker lawsuit.

Sger, moreover, agreed to Soin's suggested escrow instruction that "any law suit prior will be responsibility of seller." The evidence showed the Riker prelitigation letter was based on a July 2005 visit to the franchise and was sent to Sger months before Soin first contacted Sger about possibly purchasing the franchise. The subsequent Riker lawsuit was filed and served prior to the close of escrow. And Sger and Soin both testified that Sger told Soin he would take care of the Riker lawsuit.

In light of the waiver of the inspect and correct clause, Sger's promise to handle any lawsuits arising prior to the close of escrow, and Sger's and his wife's settlement of the Riker lawsuit, Sger and not Soin was responsible for fixing the ADA violations

15

alleged in the Riker lawsuit like the trial court found. Sger's breach therefore caused Soin's repair costs and litigation expenses damages.

III

*Fraud*

Sger contends Soin failed as a matter of law to prove two necessary elements of his fraud claim: justifiable reliance and damages.

To establish fraud, Soin had to prove that (1) Sger intentionally concealed or suppressed a material fact that he had a duty to disclose, (2) Sger concealed the fact with the intent to defraud Soin into relying on the suppressed fact, (3) he justifiably relied on Sger's concealment, and (4) resulting damages. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974; see also *Boschma v. Home Loan Center, Inc.* (2001) 198 Cal.App.4th 230, 248.) The court below found that the Riker lawsuit was an important fact Sger had a duty to disclose before finalizing the franchise sale, that Sger intentionally concealed the Riker lawsuit so that the litigation would not complicate the sale to Soin, and that Soin reasonably relied on Sger's intentional nondisclosure even though the terms of the Purchase Agreement incorporated the ADA "inspect and correct" clause contained in the Galardi Report.

The court specifically found that the "inspect and correct" clause did not preclude Soin as a matter of law from establishing justifiable reliance because it had been excused, and, in any event, the clause was similar to an exculpatory provision of dubious validity that did not allow one party to contractually exempt himself for intentional misrepresentations. The court cited *Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486 (*Manderville*) for the latter proposition.

*Manderville* involved a standardized form contract for the purchase of a parcel of land that the sellers' brokers allegedly intentionally misrepresented could be subdivided. (*Manderville, supra,* 146 Cal.App.4th at p. 1489.) Among other things, the form contract

16

provided that the buyers had the right to inspect the property and strongly advised them to investigate the condition and suitability of all aspects of the property including ordinances affecting the future development and zoning of the property. (*Id.* at p. 1492.) The contract also provided that the brokers did not guarantee and in no way assumed responsibility for the "condition" of the property. (*Ibid.*)

The *Manderville* court concluded that neither the form contract's exculpatory clauses nor the buyers' alleged lack of due diligence in exercising their right to investigate the zoning and other laws restricting the development and use of the property barred the buyers' cause of action against the brokers for intentional misrepresentation as a matter of law. (*Manderville, supra,* 146 Cal.App.4th at p. 1497.) Public policy prohibited a party from contractually exempting himself from responsibility for his own fraud. (*Id.* at p. 1499; Civ. Code, § 1668.) And, "in an action for fraud or deceit, negligence on the part of the plaintiff in failing to discover the falsity of the defendant's statement is no defense when the misrepresentation was intentional." (*Id.* at p. 1502.)

Sger does not challenge the trial court's findings regarding the materiality of the Riker lawsuit or that he intentionally failed to disclose the action to Soin. He instead argues *Manderville* is inapt, claiming that as a matter of law Soin could not have reasonably relied on his failure to disclose the Riker lawsuit because the Galardi Report already disclosed some ADA violations on the property and Soin had a contractual obligation to further investigate and repair any additional ADA violations at the franchise. Since an investigation would have revealed the ADA violations included in the Riker lawsuit, concealing the suit did not cause him to suffer any damages that he was not already contractually obligated to fix at his own expense.

Even if the "inspect and correct" clause differed from the exculpatory clauses at issue in *Manderville* and that Soin was contractually obligated to conduct an ADA inspection of the franchise as Sger contends, we nevertheless conclude he justifiably relied on Sger's intentional nondisclosure. This is because the record is devoid of any

17

evidence showing a visual inspection of the franchise for ADA violations would have revealed the material fact Sger *concealed*--the pending Riker lawsuit.

"An independent investigation or an examination of property does not preclude reliance on representations where the falsity of the statement is not apparent from an inspection, or the person making the representations has a superior knowledge . . . ." (*Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744,748 (*Bagdasrian*).)  In *Bagdasarian*, for example, the Supreme Court found that there was no evidence showing the seller's false statements regarding the amount and value of various crops, made to induce a sale of a farm, were readily apparent from a farm inspection.  (*Bagdasarian* at pp. 748-749.) Similarly, there is no evidence here showing that the existence of the Riker lawsuit would have been revealed had Soin obtained an ADA inspection.  Indeed, there is a distinct difference between ADA property defects in general and an actual ADA lawsuit against the franchise.

Other courts have recognized that the failure to disclose pending or prior litigation involving a property or business can support a claim for fraud even if the seller discloses the underlying issue or defect that is the subject of the lawsuit.  (See e.g., *Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 166 (*Calemine*); *Kuhn v. Gottfried* (1951) 103 Cal.App.2d 80, 85-86 (*Kuhn*).)  In *Calemine*, the seller had disclosed that there were existing water intrusion issues at the property but failed to disclose two prior construction defect lawsuits that were filed to remedy the water intrusion problem.  (*Calemine, supra,* 171 Cal.App.4th at pp. 165-166.)  In concluding the trial court improperly granted summary judgment for the seller, the appellate court rejected the seller's argument that the only essential fact required to be disclosed was the existence of the water intrusion itself.  (*Id.* at p. 166.)  The court instead found that "a seller's duty of disclosure encompasses disclosure of the existence of such a lawsuit," and whether the lawsuits were material to the buyer constituted a question of fact that precluded summary judgment.  (*Ibid.*)

18

In *Kuhn*, one doctor sold his medical practice to another doctor who later backed out of the transaction. (*Kuhn, supra,* 103 Cal.App.2d at pp. 85-86.) The seller sued the original buyer to enforce the contract or to collect damages. (*Id.* at pp. 82-83.) The seller then found a second buyer for the practice. (*Id.* at p. 83.) Although the seller told the second buyer that the original buyer had purchased the practice but had given it up to return to his home town, the seller never disclosed the pending litigation over the sale of the business. (*Id.* at p. 85.) The court held that the existence of the litigation was a material fact to the party contemplating purchasing the practice that affected the desirability of the property. (*Id.* at p. 86.) Because the second buyer testified that he would not have bought the business if he had known about the pending litigation, the court affirmed the judgment finding the seller had fraudulently concealed the litigation. (*Id.* at pp. 83, 86.)

In this case, while Sger did disclose some existing ADA violations to Soin via the Galardi Report substantial evidence shows he concealed the pending Riker lawsuit, a material fact which affected the desirability of the franchise. (*Kuhn, supra,* 103 Cal.App.2d at p. 86.) Because Soin's duty to obtain an ADA inspection of the property would not have revealed the lawsuit, even if it had revealed additional ADA violations, Soin's failure to conduct the inspection, whether excused or not, appears largely irrelevant. (*Bagdasarian, supra,* 31 Cal.2d at p. 748.)

Like the second buyer in *Kuhn*, Soin testified that he did not learn of the Riker lawsuit until a month after escrow closed and that had he known of the Riker lawsuit he would not have purchased the franchise. (*Kuhn, supra,* 103 Cal.App.2d at p. 86 [buyer testified that "he would not have considered buying the property had he known of the litigation"].) This evidence was sufficient to show Soin reasonably relied on Sger's concealment and would have acted differently had he been properly informed. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 200 [recognizing that the testimony of a single witness is sufficient to uphold a judgment]; *Kuhn* at p. 86.)

Neither *Bank of America Nat'l Trust & Sav. Asso. v. Vannini* (1956) 140 Cal.App.2d 120 (*Vannini*) nor *Gammad v. Citimortgage, Inc.* 2011 U.S. Dist. LEXIS 146776 (N.D. Cal. 2011) (*Gammad*), which Sger cites for the proposition that a plaintiff cannot claim he reasonably relied on a misrepresentation if the express terms of a contract contradict the alleged misrepresentation, dictate a different result.

In *Vannini*, the court held that a buyer had no right to rely on the seller's misrepresentations regarding the presence of ore in commercial quantities in a gold mine where the buyer had a contractual duty to investigate the viability of the mining operations before exercising his option to purchase the property. (*Vannini, supra,* 140 Cal.App.2d at pp 131-133.) The case fell outside the well settled rule that " '[w]here one conducts an investigation, he may still be entitled to rely upon certain representations concerning conditions as to which the investigation does not extend' " (*id.* at p. 131) because the court found an investigation would have revealed, and later did reveal, the falsity of the seller's representations. (*Id.* at pp. 132-133.)

The same is true of *Gammad*, an unpublished federal decision involving a dispute over a loan modification agreement. (Cal. Rules of Court, rule 8.1115, subd. (a); *Khani v. Ford Motor Co.* (2013) 215 Cal.App.4th 916, 922, fn. 1 ["Unpublished federal district court decisions may be persuasive authority"].) There, the plaintiffs alleged that they had been misled to believe they were getting a fixed rate loan modification but in reality they received an adjustable rate modification on which they later defaulted. (*Gammad, supra,* 2011 U.S. Dist. LEXIS 146776 at pp. *1-3.) The court found that the plaintiffs could not establish reasonable reliance because the express terms of the agreement contradicted the alleged misrepresentation. (*Id.* at p. *3.) In other words, had the plaintiffs simply read the first page of the loan modification agreement, they would have discovered the loan was an adjustable rate loan rather than a fixed rate loan. (*Id.* at p. *6.) An investigation, then, would have revealed the alleged false representation.

20

In contrast to both *Vannini* and *Gammad*, no evidence shows that an ADA inspection of the franchise would have revealed the Riker lawsuit. And because the Purchase Agreement contained a specific provision for disclosing notices of legal violations prior to the close of escrow that Sger left blank, the terms of the Purchase Agreement did not contradict Sger's misrepresentation. The cases provide little useful guidance under the circumstances.

We turn now to Sger's damages argument, which is identical to the one he raised on the breach of contract claim. Because we have already rejected the argument, we need not address the issue further as the analysis is the same. Simply put, Soin sufficiently proved Sger's fraudulent concealment of the Riker lawsuit caused him damages.

IV

*Testimony of Bal Soin*

Defendant contends the court erred in allowing Soin's uncle, Bal Soin, to testify during trial because Soin never disclosed Bal Soin as a potential witness during pretrial discovery. We disagree.

" ' "Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion." ' " (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332 (*Saxena*).) An abuse of discretion exists only if " ' "there is a clear showing [the trial court's decision] exceeded the bounds of reason, all of the circumstances being considered." ' " (*Ibid.*) Even where a trial court abuses its discretion by admitting or excluding certain evidence, such "error does not require reversal of the judgment unless the error resulted in a miscarriage of justice." (*Ibid.*) Instead, reversal is only warranted if it is "reasonably probable a more favorable result would have been reached absent the error." (*Ibid.*)

Prior to trial, defendant moved in limine to exclude Bal Soin from testifying because Soin had failed to disclose him as a witness in response to various discovery

21

requests. Soin opposed the motion, arguing that Bal Soin was not appropriate to list as a witness in response to the cited discovery requests, that he had been disclosed as a potential witness during Soin's deposition, and that, in any event, defendant himself met with plaintiff and Bal Soin prior to executing the Purchase Agreement. The court found defendant would not be prejudiced if Bal Soin testified and denied the motion.

Over defendant's renewed objection, Bal Soin testified that he met with defendant and Soin on at least three occasions where the men discussed the sale of the business, and that he filled out the Purchase Agreement for Soin and Sger with the terms they agreed upon. Bal Soin also testified that he wrote the June 2, 2006, handwritten escrow instruction stating, among other things, that "Any law suit [sic] prior will be responsibility of seller." He drafted the escrow instruction given his prior experience of having an undisclosed issue arise after escrow closed on a gas station he had purchased. He said he was not aware of the Riker lawsuit when he wrote the escrow instruction, and that if he had been he would have specifically referenced the lawsuit in the instruction. Soin testified similarly.

On this record, we cannot say the trial court abused its discretion in allowing Bal Soin to testify at trial. The interrogatory requests that Sger claims Soin improperly failed to identify Bal Soin as a person with knowledge generally covered such topics as Sger failing to disclose the Riker lawsuit, when, where, and how Soin learned of the Riker lawsuit, the ADA repairs Soin undertook at the franchise, and his alleged damages. Bal Soin, however, did not testify about these topics. He testified primarily as to how he helped fill in the Purchase Agreement with the terms Soin and Sger told him. Thus, as Soin argued below, Bal Soin was not responsive to the interrogatory requests.

Even assuming Bal Soin should have been listed as a person with knowledge in response to Sger's written discovery requests, Sger himself attended several meetings with Bal Soin where the terms of the Purchase Agreement were discussed. Thus, Sger

22

already knew Bal Soin's identity and should have been well aware that Bal Soin could be a potential witness in this action.

The record also belies the fact that being denied an opportunity to depose Bal Soin prior to trial prejudiced Sger's case or otherwise deprived him of a fair trial. Like Soin and Sger, Bal Soin testified that he filled out the Purchase Agreement on the men's behalf. While Bal Soin testified that it was his idea to include the written escrow instruction concerning prior lawsuits given his prior bad business experience, Soin essentially testified to the same thing. The factual issues to which Bal Soin testified, then, were established through other properly admitted evidence. It is thus unlikely Sger would have obtained a more favorable result in the absence of Bal Soin's testimony. Any purported error in admitting his testimony was therefore harmless. (*Saxena, supra,* 159 Cal.App.4th at p. 332.)

DISPOSITION

The judgment is affirmed. Soin is awarded his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

      HULL      , J.

We concur:

      BLEASE      , Acting P. J.

      HOCH      , J.